**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SURGALIGN HOLDINGS, INC., *et al.*[1] | ) Case No. 23-90731 (CML) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DEBTORS' MOTION FOR
ENTRY OF AN ORDER (I) AUTHORIZING
(A) THE SALE OF CERTAIN OF THE DEBTORS'
ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND
ENCUMBRANCES AND (B) ASSUMPTION AND ASSIGNMENT
OF AN UNEXPIRED LEASE AND (II) GRANTING RELATED RELIEF**

> **IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") state as follows in support of this motion (the "**Motion**"):

**Preliminary Statement**

1.      The Debtors seek authority to enter into an agreement (the "**Asset Purchase Agreement**")[2] to (i) expeditiously sell the assets constituting their medical device machine shop

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number (if any), are: Surgalign Holdings, Inc. (0607); Surgalign Spine Technologies, Inc. (6543); Pioneer Surgical Technology NewCo Inc.; Spinal Transition and Professional Services LLC; Andi's Belmarall, LLC; Fourth Dimension Spine, LLC (1107); Holo Surgical Inc. (4079); and HoloSurgical Technology Inc. (0952).  The location of the debtors' service address in these chapter 11 cases is:  520 Lake Cook Road, Suite 315, Deerfield, Illinois 60015.

[2]    Capitalized terms not used herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement attached hereto as **Exhibit A**.

(the "**Machine Shop**") to an entity formed by the lead mechanical engineer and former owner of the Machine Shop, Prompt Prototypes LLC ("**Prompt**" and together with its sole member, Peter Kopley, the "**Purchaser**"), and (ii) assign the warehouse lease associated therewith to the Purchaser.  The Debtors acquired the Machine Shop from the Purchaser in April of 2021 in an effort to expand their research and development capabilities and to create greater capacity to produce certain medical prototypes.  The acquisition closed in April 2021, pursuant to the *Asset Purchase Agreement, by and among Surgalign Holdings, Inc., Surgalign Spine Technologies, Inc., Prompt Prototypes LLC, and Peter Kopley, dated April 30, 2021* (the **Initial Purchase Agreement**").

2.     In connection with the Initial Purchase Agreement, the Debtors hired Mr. Kopley as the Director of Prototypes for Surgalign Spine Technologies, Inc.  In this role, Mr. Kopley manages the Machine Shop, which requires him to operate and maintain the Purchased Assets,[3] manage a crew of machine operators, and oversee the manufacturing and prototyping process from start to finish.  Given his specialized knowledge and unique skillset in designing the prototypes and operating the machinery, Mr. Kopley is essential to the value associated with the Purchased Assets.

3.     In connection with the Initial Purchase Agreement, Mr. Kopley also assigned the warehouse lease associated with the Machine Shop to the Debtors pursuant to the *Assignment, Assumption and Consent*.  Such assignment became effective on May 1, 2021, which coincided with the closing of the initial sale.

---

[3]   The Purchased Assets are more particularly described in <u>Schedule 1.01</u> to the Asset Purchase Agreement attached as **<u>Exhibit A</u>**.

4.     The Initial Purchase Agreement set a deferred payment schedule for the Debtors' payment of the purchase price.  To date, the Debtors have paid approximately $495,000 in cash and issued approximately $330,000[4] in restricted shares of common stock in consideration for the acquisition.  Pursuant to the Initial Purchase Agreement, the Debtors are required to pay $165,000 in cash according to the deferred payment schedule set therein.[5]

5.     In connection with the Debtors' prepetition efforts to reduce operating expenses and maximize the value of their primary business segments for sale, the Debtors determined that the prototyping facilities and capabilities of the Machine Shop are no longer necessary to the Debtors' businesses.[6]  Absent the commitment of the Purchaser, the Debtors would be forced to close and liquidate the Machine Shop.[7]  To avoid the inevitable job loss, business disruption, and potential claims against the Debtors that would result from such liquidation, the Debtors began to explore the possibility of a sale transaction with Mr. Kopley.

6.     Leading up to the Petition Date, the Debtors and the Purchaser engaged in arm's-length negotiations related to the sale of the Machine Shop (the "**Sale**").  The Purchaser was able to move quickly towards a sale because Mr. Kopley is intimately familiar with the Purchased

---

[4]   This value is calculated at the share price as of April 30, 2021 ($54.30 per share).

[5]   Additionally, under the Initial Purchase Agreement, the Debtors are obligated to transfer restricted shares of common stock with an aggregate value of $110,000 based on a share price of $54.30 per share.

[6]   For the reasons set forth herein, the Purchased Assets subject to this Motion are not be subject to the sale and auction process described in the *Debtors' Emergency Motion for Entry of: (I) An Order (A) Establishing Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors' Entry Into a Stalking Horse Agreement, (C) Establishing Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of Related Notices, (E) Scheduling a Hearing to Consider the Bid Protections and Proposed Sale, and (F) Granting Related Relief; (II) An Order (A) Authorizing And Approving the Bid Protections and (B) Granting Related Relief; and (III) An Order (A) Authorizing and Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 26].

[7]   As of the Petition Date, the estimated informal liquidation value of the Machine Shop is approximately $260,000-$280,000, excluding any wind down costs that the Debtors would incur in the liquidation process.

Assets.  Indeed, because the Purchaser is highly skilled in operating the Machine Shop's prototyping and manufacturing facilities, the Purchaser himself enhances the value and capabilities of the Machine Shop—value that would not be achievable in a sale to any other party.  Because of his relationship to the Machine Shop, the Purchaser is willing to buy the Machine Shop on an expedited basis and without any diligence outs.  The Purchaser is the only party with the experience and skillset necessary to minimize disruption to the Machine Shop while providing the most value to the Debtors and their estates.

7.  In connection with the Sale, the Purchaser has also agreed to release any and all claims that the Purchaser, including in his capacity as an employee, may hold against the Debtors. Pursuant to the Asset Purchase Agreement, the Purchaser will also assume certain liabilities related to the Purchased Assets and the Transferred Employees.  In connection with the Sale, the Purchaser will also assume obligations under the *Lease Agreement Between BKM Vista Tech 265, LLC and Surgalign Spine Technologies, Inc., dated December 15, 2022*, which relates to the warehouse that houses the Machine Shop (the "**Assigned Lease**").  In addition to cash proceeds, the Sale will relieve the Debtors of substantial contractual obligations under the Initial Purchase Agreement and under the Assigned Lease.  The Sale will also ensure continued employment in the Machine Shop for Mr. Kopley and the Transferred Employees.  Absent consummation of the Sale, the Debtors would face continued negative cash flow, wind-down and liquidation costs, and potential claims for severance obligations with respect to Mr. Kopley and the Transferred Employees.

8.  The proposed Sale is in the best interests of the estates.  Specifically, in consideration for the Sale, the Purchaser has agreed to pay the Debtors $50,000 in cash and assume certain liabilities.  Consummation of the Sale will also allow the Debtors to avoid exposure to (i) approximately $165,000 in contractual liabilities arising from the Initial Purchase Agreement,

4

(ii) approximately $47,000 in potential claims for severance obligations that may be asserted against the Debtors in the absence of the Sale, and (iii) approximately $68,523 in potential claims arising from the Debtors' rejection of the Assigned Lease in the absence of the Sale.

9.      The economic terms of the Sale are fair, reasonable, and the product of good faith, arm's-length negotiations.  The Debtors do not believe that a third-party purchaser would invest in these assets, let alone on an expedited timeframe, without any diligence outs, or for consideration as valuable as that offered by the Purchaser.  The Debtors request the Court approve the Sale.

## Relief Requested

9.      The Debtors seek entry of an order (the "**Order**"), substantially in the form attached hereto, (a) authorizing (i) the sale of the Purchased Assets constituting or used in the Machine Shop to the Purchaser pursuant to the Asset Purchase Agreement attached as **Exhibit A**, free and clear of liens, claims, interests, and encumbrances and (ii) the assumption and assignment of the Assigned Lease to the Purchaser at the closing date of the Sale[8] and (b) granting related relief.

## Jurisdiction, Venue, and Predicates for Relief

10.     The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding under 28 U.S.C. § 157(b).  The Debtors confirm their consent to the entry of a final order by the Court.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11.     The predicates for the relief requested herein are sections 105(a), 363(b), 363(f), and 363(m) of title 11 of the United States Code (the "**Bankruptcy Code**"), rule 6004 of the

---

[8]     The Debtors do not believe that there are no cure costs required under section 365 of the Bankruptcy Code to assume and assign the Assigned Lease to the Purchaser.

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rules 4002-1(e) and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**").

## Background

12.     On June 19, 2023 (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The chapter 11 cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

13.     Additional factual background and information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the commencement of these chapter 11 cases, is set forth in detail in the *Declaration of Paul Rundell, Managing Director of Alvarez & Marsal North America, LLC, in Support of Chapter 11 Petitions and Requests for First Day Relief* [Docket No. 23] (the "**First Day Declaration**"), incorporated by reference herein.

## Basis for Relief

## I.     The Proposed Sale of the Machine Shop Is Fair and Consistent with the Debtors' Reasonable Business Judgment

15.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Bankruptcy Code § 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate; however, bankruptcy courts in this District and elsewhere have required that

the authorization of such use, sale, or lease of property of the estate out of the ordinary course of business be based upon sound business justification of the trustee or debtor in possession. *See, e.g., In re Continental Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Resources Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A bankruptcy judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business but the movant must articulate some business justification for the sale.").

16.     Once the debtor articulates a valid business justification, "[t]he business judgment rule is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[A] presumption of reasonableness attaches to a Debtor's management decisions").

17.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-565 (8th Cir. 1997).

18.     The Debtors have a sound business justification for selling the Machine Shop pursuant to the terms of the Asset Purchase Agreement. The Debtors are focused on the ongoing sale process described in the First Day Declaration, with the goal of maximizing recoveries for their creditors. If the Debtors do not consummate the Sale, the Debtors' estates will be deprived of the opportunity to monetize the Machine Shop for valuable consideration. Selling the Machine

Shop to the Purchaser is an exercise of the Debtors' sound business judgment because doing so will preserve estate funds and increase creditor recoveries in these chapter 11 cases.

19.     If the Machine Shop is not sold pursuant to the Asset Purchase Agreement, the Debtors will likely have to close and liquidate the Machine Shop.

20.     Pursuant to the Sale, the Purchaser offers valuable consideration, which exceeds the liquidation value of the Purchased Assets, and avoids unnecessary loss of jobs and business disruption.  The Sale will enable the Debtors to maximize the value of the Machine Shop, avoid substantial claims and contractual obligations, and preserve value for their estates.  Consummation of the Sale also provides continued employment for the Transferred Employees, who otherwise would be terminated by the Debtors.  Any delay to consummating the Sale will necessarily result in further depreciation of the Purchased Asset's value and significant costs to the Debtors, thereby reducing creditor recoveries.

21.     Additionally, as described in further detail herein, given Mr. Kopley's technical skill, specialized knowledge and extensive experience, he is essential to the value of the Machine Shop and any other sale to a different purchaser would necessarily not include Mr. Kopley's skills and would provide a lower purchase price and far less value to the Debtors' estates.  The Debtors do not believe that there is a third party who would invest in the business under similar circumstances, let alone on expedited basis and without any diligence outs.

22.     The Sale is in the best interest of the Debtors' estates and their creditors and is consistent with the Debtors' reasonable business judgment.

## II.    The Purchaser Is Entitled to the Protections of Section 363(m) of the Bankruptcy Code.

23.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.

24. The Purchaser is a good faith purchaser as the term is used in section 363(m) of the Bankruptcy Code and, as such, is entitled to the protections of section 363(m). The Sale provides for the exchange of good and equivalent consideration. Further, the Sale is the product of arm's length negotiations between the Debtors and the Purchaser, which resulted, in the aggregate, in market terms for the Asset Purchase Agreement. Thus, the Sale to the Purchaser is proposed in good faith. The good faith finding is necessary under the Sale, and the Sale cannot proceed without it.

## III. The Debtors Should Be Authorized to Assume and Assign an Unexpired Lease to the Purchaser.

25. Section 365 of the Bankruptcy Code authorizes a debtor to assume and assign its executory contracts and unexpired leases, subject to court approval, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. A debtor's decision to assume, assume and assign, or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g.*, *Grp. of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co*., 318 U.S. 523, 550–51 (1943) (applying section 77(b) of the Bankruptcy Act, predecessor to section 365 of the

Bankruptcy Code, and rejecting test of whether executory contract was burdensome in favor of whether rejection was within the debtor's business judgment).

26.     Here, the Court should approve the assumption and assignment of the Assigned Lease.   The Assigned Lease is for a warehouse in an industrial business park that houses the Purchased Assets constituting the Machine Shop.  The Assigned Lease will expire on January 31, 2026, and is critical for the Purchaser's ability to operate the Machine Shop.  The Assigned Lease enables Mr. Kopley to utilize the Purchased Assets and is essential to consummating the Sale. Second, by service of this Motion, the counterparty to the Assigned Lease will have notice and an opportunity to raise any issues including with respect to the amount of cure costs and adequate assurance of performance with the proposed assignee.  The counterparty's rights, remedies, and defenses are preserved.  Finally, the Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code are satisfied. The Debtors assert that there are no cure costs required under section 365 of the Bankruptcy Code to assume and assign the Assigned Lease to the Purchaser.

27.     The Debtors submit that the assumption and assignment of the Assigned Lease in connection with the Sale should be authorized.

**IV.     The Proposed Sale Is Appropriate Under Bankruptcy Rule 6004.**

28.     Bankruptcy Rule 6004(f) permits a debtor to conduct a private sale pursuant to section 363 of the Bankruptcy Code.  Specifically, Bankruptcy Rule 6004(f) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction."  Fed. R. Bankr. P. 6004(f)(1).  *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 436 (Bankr. S.D. Tex. 2009) (noting that "there is no prohibition against a private sale or against a sale to insiders; and there is no requirement that the sale be by public auction").  In light of Bankruptcy Rule

6004(f) and case law regarding section 363 sales, a debtor may conduct a private sale if a good business reason exists. *See In re Condere Corp.*, 228 B.R. 615, 629 (Bankr. S.D. Miss. 1998) (authorizing private sale of debtors' tire company where "[d]ebtor has shown a sufficient business justification for the sale of the assets to the [p]urchaser").

29.     The Sale to the Purchaser is appropriate in light of the facts and circumstances of the chapter 11 cases.

30.     The transaction with the Purchaser allows the Debtors to maximize the value received for the Purchased Assets and provides a significant benefit to the Debtors' estates. The Debtors diligently considered and analyzed all reasonably available options in connection with the Sale.  The Debtors determined that the terms and conditions set forth in the Asset Purchase Agreement, including the Purchase Price and the certainty of closing provided thereby, are all fair, reasonable, and constitute the highest or otherwise best value obtainable in exchange for the Purchased Assets under the circumstances presented.  The Debtors request that the Court approve the Sale in accordance with the Assets Purchase Agreement.

## V.     The Court May Approve the Sale Free and Clear of Liens, Claims, Interests, and Encumbrances Pursuant to Section 363(f) of the Bankruptcy Code.

31.     The Court may authorize the Sale of the Purchased Assets free and clear of all liens, claims, and encumbrances because the gross purchase price will exceed the liens against the Assets.

32.     Section 363(f) of the Bankruptcy Code allows the Debtors to sell the Purchased Assets free and clear of any interest in the Purchased Assets if:

    1)     applicable nonbankruptcy law permits sale of such property
           free and clear of such interest;

    2)     such entity consents;

3)      such interest is a lien and the price at which such property is
        sold exceeds the value of all liens on such property;

4)      such interest is in bona fide dispute; or

5)      such entity could be compelled, in a legal or equitable
        proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5).  The Debtors request that the Sale to the Purchaser be free and clear of

all liens, claims, interests, and encumbrances.  In evaluating such a sale, a court must balance the

need for flexibility with the concern of affected creditors.  *In re Terrace Gardens Park P'ship*, 96

B.R. 707, 715 (Bankr. W.D. Tex. 1989).  The Court must also determine that creditors' lien rights

are adequately protected and that the offered price is the highest price and/or best terms obtainable

under the circumstances in the particular case.  *See id*.; *see also In re Beker Indus. Corp.*, 63 B.R.

474, 477–78 (Bankr. S.D.N.Y. 1986).

33.      The Purchaser will not close the Sale if the Purchased Assets are not sold free and

clear.  Further, the Debtors satisfy section 363(f)(3) of the Bankruptcy Code.  Any lien, claim,

interest, or encumbrance that exists on the Purchased Assets will be adequately protected by

attachment to the net proceeds of the Sale in the same priority that existed on the Petition Date,

subject to any claims and defenses that the Debtors may possess with respect thereto.  The Debtors

further request that any holder of a lien, claim, interest, or encumbrance that fails to timely object

to the Sale be deemed to have consented to the Sale free and clear of their purported interest or

lien under § 363(f)(2).

34.      The Debtors request that the Purchased Assets be sold to the Purchaser free and

clear of all liens, claims, and encumbrances, with such liens, claims, and encumbrances attaching

to the proceeds of the Sale.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

35.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Reservation of Rights

36.     Nothing contained in this Motion nor any action taken pursuant to the relief requested herein is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a waiver of any claim or cause of action that may exist against any creditor or interest holder; (f) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (g) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to this Motion are valid and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.

## Notice

37.     The Debtors will provide notice of this Motion to:  (a) the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the United States Attorney's Office for the Southern District

of Texas; (d) the state attorneys general for the states in which the Debtors operate; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) any known affected creditor(s) asserting a lien, claim, or encumbrance against, or interest in, the Purchased Assets; (h) the Purchaser and Purchaser's counsel; (i) the counterparty to the Assigned Lease; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Bankruptcy Local Rule 9013-1(d).  In light of the nature of the relief requested, no other or further notice need be provided.

The Debtors request that the Court enter the Order granting the relief requested in this Motion and such other and further relief as the Court deems appropriate under the circumstances.

Houston, Texas
June 22, 2023

/s/ *Veronica A. Polnick*

**JACKSON WALKER LLP**
Veronica A. Polnick (TX Bar No. 24079148)
J. Machir Stull (TX Bar No. 24070697)
Matthew D. Cavenaugh (TX Bar No. 24062656)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Email:              vpolnick@jw.com
                        mstull@jw.com
                        mcavenaugh@jw.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**WHITE & CASE LLP**
Gregory F. Pesce (admitted *pro hac vice*)
Laura Baccash (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone:      (312) 881-5400
Email:              gregory.pesce@whitecase.com
                        laura.baccash@whitecase.com

Charles R. Koster (TX Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone:      (713) 496-9700
Email:              charles.koster@whitecase.com

Barrett Lingle (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:      (212) 819-8200
Email:              barrett.lingle@whitecase.com

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on June 22, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

<u>/s/ *Veronica A. Polnick*    </u>
Veronica A. Polnick

## Exhibit A

**Asset Purchase Agreement**

**ASSET PURCHASE AGREEMENT**


DATED AS OF


JUNE 8, 2023

BY AND BETWEEN


PROMPT PROTOTYPES LLC, AS BUYER


AND


SURGALIGN SPINE TECHNOLOGIES, INC., AS SELLER

# TABLE OF CONTENTS

ARTICLE I PURCHASE AND SALE ................................................................................. 4

    Section 1.01    *Purchase and Sale of Assets* ......................................................... 4

    Section 1.02    *Assumption of Liabilities* ............................................................. 4

    Section 1.03    *Purchase Price* ............................................................................. 4

    Section 1.04    *Allocation of Purchase Price* ....................................................... 5

    Section 1.05    *Withholding Tax* ........................................................................... 5

ARTICLE II CLOSING ....................................................................................................... 5

    Section 2.01    *Closing* ......................................................................................... 5

    Section 2.02    *Seller Deliverables* ...................................................................... 5

    Section 2.03    *Buyer Deliverables* ...................................................................... 5

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER ........................ 6

    Section 3.01    *Organization and Authority of Seller; Enforceability* ................. 6

    Section 3.02    *No Conflicts; Consents* ................................................................ 6

    Section 3.03    *Title to Purchased Assets* ............................................................ 6

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER ........................ 6

    Section 4.01    *Organization and Authority of Buyer; Enforceability* ................. 6

    Section 4.02    *No Conflicts; Consents* ................................................................ 7

    Section 4.03    *Financial Assurance* .................................................................... 7

    Section 4.04    *As-is, Where-is, With all Faults Sale* .......................................... 7

ARTICLE V COVENANTS .................................................................................................. 8

    Section 5.01    *Bulk Sales Laws* ........................................................................... 8

    Section 5.02    *Transfer Taxes* ............................................................................. 8

    Section 5.03    *Further Assurances* ...................................................................... 8

    Section 5.04    *Employees of Seller and Employee Benefits* ................................ 8

ARTICLE VI TERMINATION ............................................................................................ 9

    Section 6.01    *Termination* ................................................................................. 9

    Section 6.02    *Effect of Termination* ................................................................... 9

ARTICLE VII MISCELLANEOUS ..................................................................................... 9

    Section 7.01    *Expenses* ..................................................................................... 10

    Section 7.02    *Notices* ....................................................................................... 10

Section 7.03    *Headings* .................................................................................................... 11

Section 7.04    *Severability* ................................................................................................. 11

Section 7.05    *Entire Agreement* ........................................................................................ 11

Section 7.06    *Successors and Assigns* ............................................................................... 11

Section 7.07    *No Third-party Beneficiaries* ....................................................................... 11

Section 7.08    *Amendment and Modification* ..................................................................... 11

Section 7.09    *Waiver* ......................................................................................................... 11

Section 7.10    *Governing Law* ............................................................................................ 11

Section 7.11    *Submission to Jurisdiction* .......................................................................... 11

Section 7.12    *Waiver of Jury Trial* .................................................................................... 12

Section 7.13    *Specific Performance* .................................................................................. 12

Section 7.14    *Counterparts* ............................................................................................... 12

Section 7.15    *Survival* ...................................................................................................... 12

**Schedule 1.01  Purchased Assets** .................................................................................... 15

**Schedule 1.02  Assumed Liabilities** ............................................................................... 16

**Schedule 5.01  IDENTIFIED EMPLOYEES** ................................................................... 17

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of June 8, 2023, is entered into by and between Surgalign Spine Technologies, Inc., a Delaware corporation ("Seller") and Prompt Prototypes LLC, a California limited liability company ("Buyer").

## WITNESSETH:

WHEREAS, Seller intends to commence a voluntary case (the "Bankruptcy Case") under Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq, as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the District for the Southern District of Texas (the "Bankruptcy Court");

WHEREAS, Buyer desires to purchase the Purchased Assets (as defined herein), and to assume the Assumed Liabilities (as defined herein), and Seller desires to sell the Purchased Assets to Buyer and to assign the Assumed Liabilities to Buyer;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
### PURCHASE AND SALE

Section 1.01 *Purchase and Sale of Assets*.  Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, upon the terms and subject to the conditions set forth in this Agreement, at the Closing (as defined herein), Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title and interest in and to the assets set forth in Schedule 1.01 hereto (collectively, the "Purchased Assets"), free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrance ("Encumbrance"). Seller shall not sell to Buyer, and Buyer shall not purchase from Seller, any of the assets, rights or properties of Seller, other than the Purchased Assets (such excluded assets, rights and properties, the "Excluded Assets").

Section 1.02 *Assumption of Liabilities*.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing (as defined herein), Buyer shall assume and agree to pay, perform and discharge the liabilities and obligations set forth on Schedule 1.02 hereto (collectively, the "Assumed Liabilities"). Other than the Assumed Liabilities, Buyer shall not assume any liabilities or obligations of Seller of any kind, whether matured or unmatured, fixed or unfixed, known or unknown, asserted or unasserted, liquidated or unliquidated, secured or unsecured, contingent or otherwise, whether currently existing or hereinafter created (the "Liabilities").

Section 1.03 *Purchase Price*.  Upon the terms and subject to the conditions set forth in this Agreement, in consideration of the sale, assignment, transfer, conveyance and delivery of the

Purchased Assets pursuant to Section 1.01, Buyer shall (i) at the Closing, assume, and pay, perform, satisfy and discharge when due, the Assumed Liabilities and (ii) pay to Seller an aggregate purchase price of USD $50,000 (the "Purchase Price").

Section 1.04   *Allocation of Purchase Price*.   Seller and Buyer agree to allocate the Purchase Price among the Purchased Assets for all purposes (including tax and financial accounting) as agreed by the parties hereto, negotiating in good faith. Buyer and Seller shall file all tax returns (including amended returns and claims for refund) and information reports in a manner consistent with such allocation.

Section 1.05   *Withholding Tax*.   Buyer shall be entitled to deduct and withhold from the Purchase Price all taxes that Buyer may be required to deduct and withhold under any applicable tax law. All such withheld amounts shall be treated as delivered to Seller hereunder.

ARTICLE II
CLOSING

Section 2.01   *Closing*.   Upon the terms and subject to the conditions of this Agreement, unless another date, place or time is agreed to in writing by Buyer and Seller, the closing of the transactions contemplated by this Agreement (the "Closing") shall be effected through the exchange of electronically transmitted executed documents at 9:00 a.m., Eastern Time, on the second (2nd) Business Day immediately following the date on which the Bankruptcy Court shall have entered an order (a "Sale Order") authorizing the sale of the Purchased Assets pursuant to this Agreement (the "Closing Date"). The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 12:01 a.m. on the Closing Date.

Section 2.02   *Seller Deliverables*.

    (a)   At the Closing, Seller shall deliver to Buyer:

        (i)   a copy of an assignment and assumption agreement, in a form reasonably satisfactory to Buyer and Seller, duly executed by Seller; and

        (ii)   a copy of a bill of sale, in a form reasonably satisfactory to Buyer and Seller, duly executed by Seller.

Section 2.03   *Buyer Deliverables*. At the Closing, Buyer shall deliver to Seller:

    (a)   an amount equal to the Purchase Price by wire transfer of immediately available funds to such account(s) designated in writing by Seller to Buyer at least two (2) Business Days prior to the Closing Date;

    (b)   a copy of an assignment and assumption agreement, in a form reasonably satisfactory to Buyer and Seller, duly executed by Buyer; and

    (c)   a copy of a bill of sale, in a form reasonably satisfactory to Buyer and Seller, duly executed by Buyer.

ARTICLE III
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Seller hereby represents and warrants to Buyer as follows:

Section 3.01   *Organization and Authority of Seller; Enforceability.*   Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Subject to the applicable provisions of the Bankruptcy Code, Seller has full corporate power and authority to enter into this Agreement, and, upon entry and effectiveness of the Sale Order, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of Seller, subject to the entry and effectiveness of the Sale Order. This Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject in all cases to (a) the entry and effectiveness of the Sale Order and (b) limitations on enforceability imposed by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally or by general equitable principles.

Section 3.02   *No Conflicts; Consents.*   The execution, delivery and performance by Seller of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not, except to the extent excused by or unenforceable as a result of the filing of the Bankruptcy Case and following the entry and effectiveness of the Sale Order: (a) violate or conflict with the certificate of incorporation, by-laws or other organizational documents of Seller; (b) materially violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Seller or the Purchased Assets.

Section 3.03   *Title to Purchased Assets.*   Seller owns and has good title to the Purchased Assets, free and clear of Encumbrances, except to the extent that such Encumbrances will not be enforceable against such Purchased Assets following the Closing in accordance with the Sale Order.

ARTICLE IV
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer hereby represents and warrants to Seller as follows:

Section 4.01   *Organization and Authority of Buyer; Enforceability.*   Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of California. Buyer has full limited liability company power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this

Agreement constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

Section 4.02   *No Conflicts; Consents*.   The execution, delivery and performance by Buyer of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the certificate of incorporation, by-laws or other organizational documents of Buyer; or (b) materially violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Buyer.

Section 4.03   *Financial Assurance*.   Buyer has sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Purchase Price.

Section 4.04   *As-is, Where-is, With all Faults Sale*.   Buyer agrees, warrants and represents that (a) Buyer is purchasing the Purchased Assets on an "AS IS", "WHERE IS" and "WITH ALL FAULTS" basis based solely on Buyer's own investigation of the Purchased Assets and (b) neither Seller nor any of its Representatives (as defined herein) has made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Purchased Assets, any part of the Purchased Assets, the financial performance of the Purchased Assets, or the physical condition of the Purchased Assets.   Buyer further acknowledges that the consideration for the Purchased Assets specified in this Agreement has been agreed upon by Seller and Buyer after good-faith, arms-length negotiation in light of Buyer's agreement to purchase the Purchased Assets "AS IS" and "WITH ALL FAULTS".   Buyer agrees, warrants and represents that, except as set forth in this Agreement, Buyer has relied, and shall rely, solely upon its own investigation of all such matters, and that Buyer assumes all risks with respect thereto.   EXCEPT AS SET FORTH IN ARTICLE III OF THIS AGREEMENT (AS MODIFIED OR QUALIFIED BY THE SCHEDULES HERETO OR OTHERWISE AS PROVIDED HEREIN), BUYER ACKNOWLEDGES AND AGREES THAT SELLER IS CONVEYING THE PURCHASED ASSETS WITHOUT REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED AT COMMON LAW, BY STATUTE, OR OTHERWISE (ALL OF WHICH SELLER HEREBY DISCLAIMS), RELATING TO (I) TITLE, SUITABILITY OR ADEQUACY (II) THE MERCHANTABILITY, DESIGN, OR QUALITY OF THE PURCHASED ASSETS, (III) THE FITNESS OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE OR QUALITY WITH RESPECT ANY OF THE PURCHASED ASSETS OR THE CONDITION OF THE WORKMANSHIP THEREOF OR THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT, (IV) ANY REAL OR PERSONAL PROPERTY OR ANY FIXTURES, (V) THE ABSENCE OF PATENT, LATENT OR REDHIBITORY VICES OR DEFECTS, (VI) THE ENVIRONMENTAL OR PHYSICAL CONDITION OF THE PURCHASED ASSETS (SURFACE AND SUBSURFACE), (VII) COMPLIANCE WITH APPLICABLE LAWS, (VIII) THE CONTENTS, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM OR MANAGEMENT PRESENTATION, (IX) ANY ESTIMATES OF THE VALUE OF THE PURCHASED ASSETS OR FUTURE REVENUES GENERATED BY THE PURCHASED ASSETS, (X) CONTRACTUAL, ECONOMIC, FINANCIAL INFORMATION AND/OR OTHER DATA AND ANY RELATED ESTIMATIONS OR PROJECTIONS MADE IN SALE PRESENTATIONS OR MARKETING MATERIALS, (XI) CONTINUED FINANCIAL VIABILITY, INCLUDING PRESENT OR FUTURE VALUE OR ANTICIPATED INCOME

OR PROFITS, (XII) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY THIRD PARTIES, (XIII) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE OR COMMUNICATED TO BUYER OR ITS AFFILIATES, OR ITS OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS OR ANY DISCUSSION OR PRESENTATION RELATING THERETO, (XIV) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM INTELLECTUAL PROPERTY INFRINGEMENT, MISAPPROPRIATION OR OTHER VIOLATION OR (XV) ANY OTHER MATTER WHATSOEVER (INCLUDING THE ACCURACY OR COMPLETENESS OF ANY INFORMATION PROVIDED TO BUYER), IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES THAT BUYER WILL BE DEEMED TO BE OBTAINING THE PURCHASED ASSETS IN THEIR PRESENT STATUS, CONDITION AND STATE OF REPAIR, "AS IS" AND WITH ALL FAULTS AND THAT BUYER HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS AS BUYER DEEMS APPROPRIATE AND BUYER IRREVOCABLY WAIVES ANY AND ALL CLAIMS IT MAY HAVE AGAINST SELLER ASSOCIATED WITH THE SAME.

ARTICLE V
**Covenants**

Section 5.01    *Bulk Sales Laws*.    The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

Section 5.02    *Transfer Taxes*.    All transfer, documentary, sales, use, stamp, registration, value added and other such taxes and fees (including any penalties and interest) incurred in connection with this Agreement shall be borne and paid by Buyer when due. Buyer shall, at its own expense, timely file any tax return or other document with respect to such taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

Section 5.03    *Further Assurances*.    Following the Closing, each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

Section 5.04    *Employees of Seller and Employee Benefits*.    From and after the time the transaction contemplated by this Agreement is announced to the public through and with the consent of Seller, Buyer may contact and communicate with the employees of Seller identified in Schedule 5.01 hereto ("Identified Employees") regarding employment opportunities with Buyer; provided such contact and communications shall not interfere with Seller's operations.  Prior to the Closing Date, Buyer shall make written offers of employment (each, an "Offer"), conditional and effective on the Closing Date, to all Identified Employees. Identified Employees who accept an Offer become "Transferred Employees". Identified Employees who decline an Offer shall be referred to as "Non-Transferred Employees". On the Closing Date, Seller shall terminate the employment of the Transferred Employees.  Buyer acknowledges and agrees that it is solely responsible for its decision(s) to offer employment to the Identified Employees.  Buyer further

acknowledges and agrees that Seller shall have no involvement or participation in Buyer's decision(s) in this regard or with respect to Buyer's interviews, offers, employment criteria, employment terms to be offered, or any other aspect of Buyer's hiring process, which is exclusively its own.  Nothing in this Agreement will be deemed to obligate Buyer to continue any employment, or dictate the terms or conditions of any employment, for any period. From and after the Closing, Buyer shall be responsible for, and assume, all Liabilities relating to unpaid wages, salaries, commissions and other amounts, earned or accrued by or in respect of employees of the Transferred Employees.

ARTICLE VI
**Termination**

Section 6.01   *Termination*.  At any time prior to the Closing, this Agreement may be terminated and the transactions contemplated hereby abandoned as follows:

    (a)    by the mutual written consent of Buyer and Seller; or

    (b)    by Seller if Seller or the board of directors (or similar governing body) of Seller determines that proceeding with the transactions contemplated hereby or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties; or

    (c)    by either Buyer or Seller, by written notice to the other party, if the Closing shall not have occurred on or before [●], 2023, or such other date that Buyer and Seller may agree upon in writing (the "Termination Date"); provided, however, that the right to terminate this Agreement pursuant to this Section 6.01(b) shall not be available to Buyer or Seller, as the case may be, if a material breach of this Agreement by such party has resulted in the failure of the Closing to occur before the Termination Date.

Section 6.02   *Effect of Termination*.  In the event of the termination of this Agreement in accordance with this Article VI:

    (a)    this Agreement shall forthwith become null and void (except for this Section 6.02 (*Effect of Termination*) and Article VII (*Miscellaneous*), each of which shall survive such termination and remain valid and binding obligations of the parties in accordance with their terms); and

    (b)    there shall be no Liability of any kind on the part of Buyer or Seller; provided, however, that termination pursuant to this Article VI shall not relieve either party from such Liability (i) pursuant to the Sections specified in Section 6.01 that survive termination or (ii) for any willful and material breach of this Agreement prior to such termination.

ARTICLE VII
**MISCELLANEOUS**

9

Section 7.01  *Expenses*.  All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

Section 7.02  *Notices*.  Except as otherwise provided herein, all notices, requests, claims, demands, waivers and other communications hereunder shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by or email transmission in the case of email transmission, with copies by overnight courier service or registered mail to the respective parties as follows (or, in each case, as otherwise notified by any of the parties hereto) and shall be effective and deemed to have been given (i) immediately when sent by email between 9:00 a.m. and 6:00 p.m. (New York City time) on any day except a Saturday, a Sunday or any other day on which commercial banks are required or authorized to close in New York, New York (a "Business Day") (and when sent outside of such hours, at 9:00 a.m. (New York City time) on the next Business Day), and (ii) when received if delivered by hand or overnight courier service or certified or registered mail on any Business Day:

If to Seller:

Surgalign Spine Technologies, Inc.
520 Lake Cook Road
Suite 315
Deerfield, Illinois 60015

E-mail:          pamoruso@surgalign.com
Attention:      Paolo Amoruso

with a copy (which shall not constitute notice) to:

White & Case LLP
111 South Wacker Drive
Suite 5100
Chicago, Illinois 60606-4302

Email:          gregory.pesce@whitecase.com
Attention:      Gregory Pesce

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020

Email:          adam.cieply@whitecase.com
Attention:      Adam Cieply

If to Buyer:

Prompt Prototypes LLC
1322 Kelglen Lane
Vista, California

E-mail:          pkopley@gmail.com

10

Attention:        Peter Kopley

Section 7.03    *Headings*.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

Section 7.04    *Severability*.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

Section 7.05    *Entire Agreement*.   This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

Section 7.06    *Successors and Assigns*.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

Section 7.07    *No Third-party Beneficiaries*.  This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 7.08    *Amendment and Modification*.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

Section 7.09    *Waiver*.  No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Section 7.10    *Governing Law*.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law, provision or rule.

Section 7.11    *Submission to Jurisdiction*.  Each party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contemplated hereby exclusively in the Bankruptcy Court, provided, however, that, if the Bankruptcy Case has not yet been commenced, the Bankruptcy Case is closed pursuant to

section 350 of the Bankruptcy Code or the Bankruptcy Court does not have subject-matter jurisdiction over such action, each of the parties hereto irrevocably agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contemplated hereby exclusively in the United States District Court for the Southern District of New York or any New York State court, in each case sitting in the City and County of New York (the Bankruptcy Court or such other court, as applicable, the "Chosen Courts"), and solely in connection with claims arising out of or related to this Agreement or the transactions contemplated hereby (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto and (d) agrees that service of process upon such party in any such action or proceeding shall be effective if notice is given in accordance with Section 7.02.

Section 7.12    *Waiver of Jury Trial*.   Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

Section 7.13    *Specific Performance*.   The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

Section 7.14    *Counterparts*.   This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.15    *Survival*.

(a)    None of the representations and warranties of Seller in this Agreement, in any instrument delivered pursuant to this Agreement, or in the Schedules attached hereto shall survive the Closing, and Buyer shall not, and shall not be entitled to, make any Claim or initiate any action against Seller, its Affiliates or their respective Representatives with respect to any such representation or warranty from or after the Closing. None of the covenants or agreements of the parties in this Agreement shall survive the Closing, and no party hereto shall, or shall be entitled to, make any Claim or initiate any action against any other party with respect to any such covenant or agreement from or after the Closing, other than (a) the covenants and agreements of the parties contained in this ARTICLE VII, ARTICLE V and ARTICLE IV, and (b) those other covenants and agreements contained herein that by their terms apply, or that are to be performed in whole or in part, after the Closing, which shall survive the consummation of the transactions contemplated by this Agreement until fully performed in accordance with its terms.

(b)    For purposes of this Section 7.01:

(i)  "Affiliate" means, with respect to Seller, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such specified Person.  For purposes of this definition, "control" (and any similar term) means the power of one or more Persons (directly or indirectly through one or more intermediaries) to direct, or cause the direction of, the management or affairs of another Person by reason of ownership of voting interests or by contract or otherwise.

(ii)  "Claim" has the meaning given to such term in Section 101(5) of the Bankruptcy Code.

(iii)  "Governmental Authority" means any federal, municipal, state, provincial, territorial, local or foreign governmental or quasi-governmental, administrative or regulatory authority, department, agency, board, bureau, official, commission, body or other similar authority or instrumentality (including any self-regulatory authority, securities exchange, court or similar tribunal).

(iv)  "Person" means any individual, corporation, partnership, limited partnership, limited liability company, syndicate, group, trust, association or other organization or entity or Governmental Authority.  References to any Person include such Person's successors and permitted assigns.

(v)  "Representatives" means, with respect to a particular Person, any director, officer, employee or other authorized representative of such Person or its Subsidiaries, including such Person's attorneys, accountants, financial advisors and restructuring advisors.

(vi)  "Subsidiary" means, with respect to any Person, (a) any corporation or similar entity of which more than 50% of the securities or interests having, by their terms, ordinary voting power to elect a majority of the members of the board of directors, or other persons performing similar functions with respect to such corporation or similar entity, is held, directly or indirectly by such Person and (b) any partnership, limited liability company or similar entity of which (i) such Person is a general partner or managing member or has the power to direct the policies, management or affairs, or (ii) such Person possesses, directly or indirectly, a 50% or greater interest in the total capitalization or total income of such partnership, limited liability company or similar entity.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

SURGALIGN SPINE TECHNOLOGIES, INC.

By_____

Name: Paolo Amoruso

Title: Chief Legal Officer and Corporate Secretary


PROMPT PROTOTYPES LLC


By_____

Name:  Peter Kopley

Title:  President

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

SURGALIGN SPINE
TECHNOLOGIES, INC.

By_____

Name:

Title:

PROMPT PROTOTYPES LLC

By _____

Name:  Peter Kopley

Title:  President

**SCHEDULE 1.01**

**PURCHASED ASSETS**

[●].

| schedule 1.01 Purchased Assets |
| --- |
| VF2 1 2018 Haas VF2SS TRT-100 |
| VF2 2 2019 Haas VF2SS TRT-100 |
| Tornos 1 2007 Tornos Sigma 20/6 |
| Robobar 1 Tornos Robobar 560 BarFeeder |
| Tornos 2 2008 Tornos Sigma 20/6 |
| Robobar 2 Tornos Robobar 560 BarFeeder |
| Transformer Eaton 208-480 Step Up/Down Transformer |
| Heat Treat Furnace 1 CM Furnace L3 2300F Tube Furnace 3' Long |
| Heat Treat Furnace 2 Vulcan 12" 1800F Lab Furnace |
| Laser Engraver 1 Raycus 30W MOPA 20-80Hz Fiber Laser Engraver |
| Laser Engraver 2 JPT 50W MOPA 1-5000Hz Fiber Laser Engraver |
| Laser Welder 300W YAG Laser Welder |
| Laser Welder 300W YAG Laser Welder |
| Optical Comparator Mitutoyo PH-A14 Optical Comparator |
| Rotary Air Compressor Atlas Copco 8hp Rotary Screw with Dryer w/50Gal |
| Hardinge Lathe Hardinge Chucker Precision Manual Lathe w/swiss collets 1 Schublin SL70 2000 05.31.18 06.12.18 |
| Mitutoyo CMM Mitutoyo BH-305 Manual CMM w/Heidenhain Quadracheck |
| NSK Controller NSK E2550 Control 1 NSK E2550 2020 04.22.20 05.02.20 |
| NSK Controller 2 NSK E3000 Control 2 NSK E3000 2018 10.1.18 10.09.18 |
| NSK Spindle 1 NSK 22.5mm 50k Spindle |
| NSK Spindle 3 NSK 22.5mm 50k Spindle 2 NSK N2851 2018 03.13.18 03.27.18 |
| NSK Spindle 6 NSK 32mm 50k Spindle 1 NSK N2852 2019 02.02.19 02.15.19 |
| CAT 40 Tool Holders 60+ CAT 40 Tool Holder Various Configurations |
| Collets Collets for CAT 40 Tool holders 60 CAT40 CAT41 2018 01.09.18-10.13.20 - |
| 5Axis Fixture 1 5Axis Rock Lock Modular Fixture VF2ss 1 2 5axis 100RL 2017 12.11.17 12.19.17 |
| 5Axis Vise 1 5Axis 100mm Vise VF2ss 2 5axis 100RL 2019 07.22.19 08.03.19 |
| Thread Whirler Thread Whirler for Tornos Sigma |
| Milling Attachment Tornot Milling Attachment 8 Tornos 108-XXX 2007-2008 12.15.16 01.15.17 |
| Inspection Microscope AM Scope w Inspection Camera and measurement 1 AM Scope .7-3.5X 2017 03.18.17 03.21.17 |
| Toolmaker Microscope Mitutoyo Toolmaker Microscope 1 Mitutoyo 176+902-1A 2017 03.18.17 03.21.17 |
| Tool Grinder Agathon Custom Tool Cutter Grinder |
| Guide Bushing CD25 Guide Bushings Various Sizes 20 Hardinge CD25 2017 01.09.18-10.13.20 - |
| Swiss Collets 0161 Swiss Style Collets Various Sizes 40 Hardinge 0161 2017 01.09.18-10.13.20 - |
| Bead Blast Cabinet Trinco Blast Cabinet 2 Trinco 20/CDB 2010 10.06.20 10.14.20 |
| Surface Plate 1 Starret 2x3' Surface Plate on Rolling Frame 1 Starret - 2017 11.30.18 12.4.18 |
| Mitutoyo Caliper Mitutoyo Caliper 4 Mitutoyo - 2017 06.25.17 07.02.17 |

Mitutoyo Micrometer 1 Mitutoyo Micrometer 2 Mitutoyo - 2020 06.25.20 07.08.20

Cetus Cetus 3D Printer

Mark 10 Mark 10 Force gauge w/test frame 1 Mark MARK 3 2020 01.26.20 02.01.20

Rockwell Tester Rockwell Tester 1 n/a n/a 2018 04.01.18

Tooling Endmills >100 n/a n/a 2019 2017-2021 2017-2022

Tooling Drills >100 n/a n/a 2020 2017-2021 2017-2022

Tooling Taps >50 n/a n/a 2021 2017-2021 2017-2022

Tooling Gauges >20 n/a n/a 2022 2017-2021 2017-2022

Raw Material R&D Materials >100 n/a n/a 2023 2017-2021 2017-2022

Raw Material 465 >100 n/a n/a 2024 2017-2021 2017-2022

Raw Material 455 >100 n/a n/a 2025 2017-2021 2017-2022

Raw Material 17-4 >100 n/a n/a 2026 2017-2021 2017-2022

Raw Material tianium >100 n/a n/a 2027 2017-2021 2017-2022

elctro Finishing Rectifier 2 Voltec MY1560S 2028 2017-2021 2017-2022

Safety Equipment Safety 5 n/a n/a 2029 2017-2021 2017-2021

Machine Probing Renishaw Pro

Tooling Kurt Vise 2 Kurt Kurt 2031 07.22.19 08.18.19

Tornos Tooling Swiss Tooling

Raw Material Rack

Work Benches 7 Lista Workbenches

 Tool & Storage boxes 5 Lista and 1 additional Rolling and Stationary Cabinets

Office Furnature 3 Desks, 3 Filing cabinets, several chairs

Surface Plates 2 Starret 2x3' Surface Plate on Rolling Frame

Precision work holding 4 Machinist Vises and 3 Vblock Sets

Rotary Broach Slater Slim Line Rotary Broach

Tooling Various Size Tooling, Endmill, Drill, Tap, etc

Bench Grinder and Buffer 2 Bech Grinders & 1 Buffer

Part Finishing Equipment Vibratory finisher, Passivation tank

Horizontal Saw

Drill Press

Absolute Arm 85 Hexagon

Power Sonic

Power Sonic

Power Sonic

Power Sonic

FANUC α-C400iC

MYFORD SUPER 7

VERTICAL MILLING MACHINE

GAGE PIN MØ MINUS 50 PCS

GAGE PIN MØ MINUS 50 PCS

GAGE PIN BLACK GUARD

GAGE PIN M1 MINUS 90 PCS

GAGE PIN M2 MINUS 250 PCS

GAGE PIN M3 MINUS 125 PCS

GAGE PIN 1.3MM - 4.98MM PLUS

GAGE PIN 5MM - 9.98MM PLUS
GAGE PIN 10MM - 13.98MM PLUS
GAGE PIN MØ MINUS 50 PCS
GAGE BLOCK .05"-4"
Large Wheeled Toolbox

## SCHEDULE 1.02

## ASSUMED LIABILITIES

(a)    All Liabilities in respect of the Transferred Employees incurred pursuant to Section 5.01.

(b)    All Liabilities under the Purchased Assets first arising in respect of the period after the Closing, except that Buyer shall not assume or agree to pay, discharge or perform any Liabilities arising out of any default or breach existing at, prior to, or as a consequence of, Closing.

## **SCHEDULE 5.01**

## **IDENTIFIED EMPLOYEES**

Dave Draper

Martin Ramirez

Martin Ramirez-Faurretia