IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| SURGALIGN HOLDINGS, INC., *et al.*[1] | ) Case No. 23-90731 (CML) |
| Debtors. | ) (Jointly Administered) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DEBTORS' SALE INCENTIVE PROGRAM AND (II) GRANTING RELATED RELIEF**

> **IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") state as follows in support of this motion (this "**Motion**"):

**Preliminary Statement**

1. The Debtors commenced these chapter 11 cases to maximize value for all stakeholders by conducting a sale of substantially all of their assets, including their hardware and biomaterials and digital health businesses. The Debtors are on their way to successfully executing that strategy, having already entered into a binding commitment with Xtant Medical Holdings, Inc. ("**Xtant**") to purchase substantially all of the assets encompassing the U.S. hardware and

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number (if any), are: Surgalign Holdings, Inc. (0607); Surgalign Spine Technologies, Inc. (6543); Pioneer Surgical Technology NewCo Inc.; Spinal Transition and Professional Services LLC); Andi's Belmarall, LLC; Fourth Dimension Spine, LLC (1107); Holo Surgical Inc. (4079); and HoloSurgical Technology Inc. (0952). The location of the debtors' service address in these chapter 11 cases is: 520 Lake Cook Road, Suite 315, Deerfield, Illinois 60015.

biomaterials business and the equity interests in certain non-Debtor entities that operate the Debtors' hardware business outside of the United States. On June 18, 2023, the Debtors entered into an asset purchase agreement (the "**Stalking Horse Agreement**") memorializing the Xtant bid. Last week, the Court approved the bid protections and bid procedures contemplated by the Stalking Horse Agreement.

2.    Notwithstanding the Debtors' progress to date, significant work remains to be done to effectuate the sale process. Specifically, among other things, the Debtors must complete the marketing process on a compressed timeline, prepare for and coordinate the transition of the hardware business to Xtant or another purchaser to the extent Xtant is not the successful bidder at the auction, and negotiate with their key constituents in connection with the Xtant sale and otherwise. The Debtors must also obtain a binding bid for the digital assets, which were excluded from the Xtant bid and for which there is not yet a binding commitment. None of this can be achieved without the continued efforts, dedication, and support of certain of the Debtors' key senior executives (collectively, the "**Executives**").[2] The Executives have extensive industry expertise and knowledge of the Debtors' businesses, assets, liabilities, counterparties, and operations, and they are vital to the Debtors' execution of the sale process and the success of these chapter 11 cases. The Executives—with assistance from the Debtors' professionals—are working around the clock above and beyond their normal duties to ensure the success of the Debtors' sale process. Among other things, the Executives are engaging with potential bidders for the Debtors' assets and key contract counterparties to ensure a smooth transition as part of the sale. In addition to their efforts in connection with the sale process, the Executives are tasked with overseeing

---

[2]  The Executives include the Debtors' (a) President and Chief Executive Officer, (b) Chief Financial Officer, and (c) Vice President and Chief Accounting Officer.

2

the Debtors' ordinary course operations, which include 112 employees and 21 consultants performing services in the United States.

3. To ensure the success of the sale process, the independent directors of Surgalign Holdings, Inc. (the "**Independent Directors**"), with input from the Debtors' counsel and financial advisor, Alvarez & Marsal North America, LLC ("**A&M**"), determined that it was necessary and appropriate to implement a sale incentive program (the "**Sale Incentive Program**") to ensure the Executives were incentivized to maximize the success of the sale process. Thereafter, the Independent Directors, with input from the Debtors' advisors, developed the Sale Incentive Program.

4. The implementation of the Sale Incentive Program is reasonable, well within the Debtors' business judgment, and satisfies the requirements for approval under the Bankruptcy Code. There is no possibility for the Debtors—a company with limited liquidity that is running a sale of all of their assets—to replace the Executives at this juncture. Nor could the Debtors' professionals provide interim management that could replace the Executives' relationships with key customers, suppliers, and other counterparties in light of the relationship-driven, specialized industry in which the Debtors operate. Moreover, the success of the chapter 11 cases, including the execution of the sale process, is by no means guaranteed and will turn in large part on the performance and productivity of the Executives, who have been called upon to undertake additional responsibilities and to work significantly longer hours than contemplated under the normal terms of their employment. Under these circumstances, providing appropriate incentives is critical to the sale process and maximizing recoveries to creditors. Accordingly, the Debtors respectfully request that the Court approve the Sale Incentive Program.

**Relief Requested**

5. The Debtors seek entry of an order, substantially in the form attached hereto (the "**Order**"), (a) approving the Debtors' Sale Incentive Program for the Executives, two of whom may be considered "insiders" (as such term is defined in section 101(31) of the Bankruptcy Code), tied to amounts realized in sale transactions for the Debtors' hardware and biomaterials and digital health businesses, and (b) granting related relief.

**Jurisdiction, Venue, and Predicates for Relief**

6. The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding under 28 U.S.C. § 157(b). The Debtors confirm their consent to the entry of a final order by the Court. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7. The predicates for the relief requested herein are sections 363(b) and 503(c) of title 11 of the United States Code (the "**Bankruptcy Code**") and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**").

**Background**

8. On June 19, 2023 (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The chapter 11 cases are being jointly administered pursuant to Bankruptcy Rule 1015(b). On June 29, 2023, the U.S. Trustee appointed the Official Committee of Unsecured Creditors (the "**Committee**") pursuant to section 1102(a)(1) and 1102(b)(1) of the Bankruptcy Code. *See* Docket No. 121. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

9. Additional factual background and information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the commencement of these chapter 11 cases, is set forth in detail in the *Declaration of Paul Rundell, Managing Director of Alvarez & Marsal North America, LLC, in Support of Chapter 11 Petitions and Requests for First Day Relief* [Docket No. 23] (the "**First Day Declaration**"),[3] incorporated by reference herein.

## Sale Incentive Program

### I. Development of the Sale Incentive Program

10. The Independent Directors determined that there is an acute need to incentivize their senior executives for the success of the chapter 11 cases. The Independent Directors enlisted the services of the Debtors' financial advisor, A&M, to support the development of the Sale Incentive Program. A&M has significant experience in designing executive incentive plans for companies in chapter 11 and has access to extensive industry compensation data. The Independent Directors, the Debtors' counsel, and A&M reviewed the Debtors' employment requirements during these chapter 11 cases, and the attendant necessary features of incentive plans. A&M assisted the Independent Directors in designing the Sale Incentive Program, keeping in mind the Debtors' goals of maximizing value, consummating a sale or several sales of the Debtors' assets, and ensuring effective management throughout these chapter 11 cases. The Sale Incentive Program was designed to promote appropriate and reasonable incentives.

11. A&M also worked closely with the Independent Directors to ensure that the Sale Incentive Program was competitive within the industry, and that the incentives set for

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

the Executives participating in the Sale Incentive Program were appropriate. The Independent Directors and A&M reviewed market comparisons within a bankruptcy context and historical compensation levels. With regard to the market comparisons within the bankruptcy context, A&M reviewed several incentive-based programs that have been approved for other companies of similar size going through chapter 11 and running a sale process in recent years. Accordingly, the Independent Directors and A&M developed the Sale Incentive Program to be comparable to plans similar in design and scope that have been recently approved by bankruptcy courts. A&M and the Independent Directors used this market research in preparing proposals for the Sale Incentive Program, which underwent several rounds of revisions before being submitted for consideration to the Debtors' board of directors.

## II.    The Executives

12.    The Executives are the Debtors' President and Chief Executive Officer, Chief Financial Officer, and Vice President and Chief Accounting Officer. This team is vital to the ongoing stability, continuity, and strength of the Debtors during these chapter 11 cases. Not only are the Executives responsible for executing the Debtors' operating and strategic plans, including maintaining the Debtors' business operations and overseeing and addressing issues during these chapter 11 cases, the Executives have played, and will continue to play, a central role and are critical to the overall success of the marketing and sale process. Indeed, the Executives worked to negotiate the Stalking Horse Agreement, facilitate due diligence with the stalking horse and other bidders, and share their significant institutional knowledge of the Debtors' business and industry with prospective bidders to ensure the Debtors receive top dollar. Specifically, the Executives will continue to meaningfully contribute to the success of the sale process and recoveries to creditors by taking the following actions, among others:

6

- leverage longstanding relationships and personal credibility to foster strong bids and a robust auction;

- lead or support negotiations with vendors, customers, and other key constituents in connection with the sale process and otherwise;

- review and respond to diligence and other information requests;

- conduct management meetings with the Stalking Horse Bidder as well as the other potential bidders;

- proactively develop a transition plan and budget to assist in the transition of the operations of the Debtors to any successful bidder(s);

- implement "first day" and other relief to stabilize the Debtors' businesses and operations;

- educate bidders about operating the acquired assets as a going concern and potential upside opportunities with respect to operational cost savings; and

- assist with transition and wind down planning.

**III.    The Terms of the Sale Incentive Program**

13.    Under the proposed Sale Incentive Program, payments to the Executives are based on amounts realized in sale transactions for the Debtors' two business segments.

14.    The $5,000,000 cash purchase price included in the Stalking Horse Agreement is used as the baseline for a sale of the Debtors' U.S. and international hardware and biomaterials business and sets a "floor" for the Debtors' competitive auction process that will permit other potentially interested parties to submit topping bids. For any cash realized in excess of $5,000,000 for the hardware business, the Executives will share in 10% of such increase. For example, if the Debtors sell the hardware business for $10,000,000, the Executives would share in a pool of $500,000 (*i.e.*, 10% of the $5,000,000 in excess of the $5,000,000 purchase price under the Stalking Horse Agreement).

15.    In connection with a sale of the digital health business, the Executives will share in 20% of the purchase price (*i.e.*, cash received plus the dollar amount of liabilities assumed by the

purchaser that are not otherwise subject to compromise in the chapter 11 process and must be paid in full in cash to confirm a chapter 11 plan). For example, if the Debtors sell the digital health business for $1,000,000 in cash and assumed liabilities that are not subject to compromise in the chapter 11 process, the Executives would share in a pool of $200,000 (*i.e.*, 20% of the $1,000,000 purchase price). The pool available to the Executives in connection with a sale of the digital health business shall be capped at ▮▮▮▮▮▮.

16. Any payments made under the Sale Incentive Program will be allocated as follows: 55% to the President and Chief Executive Officer; 35% to the Chief Financial Officer; and 10% to the Vice President and Chief Accounting Officer.[4]

### Basis for Relief

**I.     The Sale Incentive Program Should Be Approved Pursuant to Section 363(b) of the Bankruptcy Code.**

17. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that debtors "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b) of the Bankruptcy Code, courts require only that the debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted); *see also In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 20, 2012) (noting that it is "well-settled" that a debtor may use its assets outside the ordinary course where such use "represents the sound exercise of business judgment"). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to

---

[4]  The Debtors have not included target awards for the proposed Sale Incentive Program in this Motion because the total purchase prices for sales of the Debtors' hardware and biomaterials and digital health businesses (and thus any target) are not known given the competiveness of the Debtors' sale process to date.

the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

18. Here, there is no question that a sound business purpose exists to implement the Sale Incentive Program to properly incentivize the Executives. **First**, the Executives have the most significant ability to drive value for stakeholders. The Executives are in positions that are most integral to the Debtors' chapter 11 process and are leading the charge with respect to ensuring that the Debtors and their advisors are working expeditiously to achieve a value-maximizing sale. The Sale Incentive Program will incentivize the Executives to continue to leverage their extensive personal relationships with potential buyers, customers, and vendors, which cannot be replicated and have been instrumental to the success of the sale process to date.

19. **Second**, the Debtors' sale initiatives have placed additional demands on the Executives, making the provision of appropriate, market-based compensation and incentives essential to the success of these chapter 11 cases. In addition to their ordinary-course activities needed to drive the Debtors' overall performance, the Executives must work diligently to manage the Debtors' sale process.

20. **Third**, the Sale Incentive Program aligns the interests of the Debtors, the Executives, and all stakeholders in these chapter 11 cases. The Debtors have structured the Sale Incentive Program carefully to incentivize the Executives to drive a successful marketing and sale process. By linking the Executives' increased compensation opportunities to sales and increased purchased prices related thereto, the Sale Incentive Program successfully and fairly aligns the interests of the Debtors, their employees, and their stakeholders. Thus, the Sale

Incentive Program is designed to achieve "desired performance." *See In re Dana Corp.*, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006).

21. *Fourth*, the Executives will earn payments if and only if the Debtors meet objective, value-maximizing sale metrics. Courts routinely approve employee incentive programs like the Sale Incentive Program that incentivize management to achieve performance targets to maximize value for a debtor's estate at a reasonable cost, which is a win for all stakeholders. *See, e.g.*, *In re Glob. Home Prods. LLC*, 369 B.R. 778, 784 (Bankr. D. Del. 2007) ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment.") (internal citation omitted).

22. *Fifth*, the Sale Incentive Program's award amounts are reasonable. The Debtors analyzed award opportunities using benchmarks from other court-approved sale incentive plans. A&M determined the award opportunities and potential costs of the Sale Incentive Program are reasonable and within market practice. In addition, based on a study of market compensation prepared for the Debtors prior to the Petition Date, the absence of an incentive opportunity for the Executives would significantly undermine the competitiveness of the Debtors' compensation programs, which could impact the Debtors' ability to motivate the Executives to secure a bid above the $5,000,000 stalking horse bid for the U.S. hardware and biomaterials business and obtain a binding bid for the Debtors' digital assets.

23. Implementing the Sale Incentive Program is a valid exercise of the Debtors' business judgment and should be approved as the Sale Incentive Program is in the best interests of the Debtors, their estates, and all parties in interest in these chapter 11 cases.

II. **The Sale Incentive Program Satisfies Section 503(c) of the Bankruptcy Code.**

24. Some or all of the Executives may be "insiders" within the meaning of section 101(31) of the Bankruptcy Code and, therefore, the Sale Incentive Program could implicate

section 503(c) of the Bankruptcy Code. Section 503(c) of the Bankruptcy Code contains three subsections: (a) section 503(c)(1) contains a general prohibition of retention plans; (b) section 503(c)(2) places limitations on severance payments; and (c) section 503(c)(3) sets forth standards governing other transfers to insiders. 11 U.S.C. § 503(c). The Debtors submit that neither sections 503(c)(1) nor 503(c)(2) of the Bankruptcy Code are applicable under the circumstances. In addition, although section 503(c)(3) of the Bankruptcy Code may be applicable to the Sale Incentive Program, review of a business decision regarding compensation pursuant to section 503(c)(3) of the Bankruptcy Code mirrors review under the business judgment rule pursuant to section 363(b) of the Bankruptcy Code. *See Dana Corp.*, 358 B.R. at 576 (applying the business judgment rule to evaluate a proposed incentive plan). Accordingly, the Sale Incentive Program should be authorized as a sound exercise of the Debtors' business judgment.

A. **The Sale Incentive Program Is Not a Retention Plan Governed by Section 503(c)(1) or a Severance Plan Governed by Section 503(c)(2).**

25. Section 503(c)(1) of the Bankruptcy Code applies solely to retention plans. 11 U.S.C. § 503(c)(1). Section 503(c)(2) provides for restrictions applicable only to severance plans. 11 U.S.C. § 503(c)(2). Neither provision applies to performance-based incentive plans. *See, e.g.*, *In re Velo Holdings, Inc.*, No. 12-11384 (MG), 2012 WL 2015870, at *6 (Bankr. S.D.N.Y. June 6, 2012) (finding that an incentive-based plan alleviated the need for a section 503(c)(1) analysis); *In re Borders Grp.*, 453 B.R. 459, 471 (Bankr. S.D.N.Y. 2011) (finding that "the Debtors [had] met their burden of establishing that the KEIP [was] incentivizing, thereby alleviating the need for a section 503(c)(1) analysis").

26. Merely stylizing a compensation program as an "incentive" plan, however, does not automatically exempt insider compensation from the requirements of section 503(c)(1) of the Bankruptcy Code. *See, e.g.*, *In re Residential Cap., LLC*, 478 B.R. 154, 170 (Bankr. S.D.N.Y.

11

2012) ("The Debtors must show that the KEIP is a 'pay for value' plan that offers incentives based on performance rather than a 'pay to stay' plan."); *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012) ("The Court must examine a proposed KEIP . . . [to] determine whether the proposed targets are designed to motivate insiders to rise to a challenge or merely report to work."). The milestones and targets triggering the incentives must force the participants to stretch and cannot be compared to "lay-ups" for the ease by which the participants could achieve the targets. *See Dana Corp.*, 358 B.R. at 583.

27. The primary effect of the Sale Incentive Program is to incentivize the Executives in a manner that will benefit the Debtors' business as a whole and, as a result, all stakeholders. The Sale Incentive Program is not predicated on retention or severance payments. The Executives are not paid in the event their employment is terminated for cause, nor are they paid merely for staying employed for a certain time period. Rather, the Sale Incentive Program allocates payments to the three senior executives of the Debtors who are most critical to maximizing the value of the Debtors' business and consummating a sale. The Sale Incentive Program has been crafted with great care to ensure it directly incentivizes the Executives to actively market the Debtors' assets and meet the objectives of the sale process.

28. The Sale Incentive Program encourages the Executives to achieve the highest possible sale value. The Executives will receive the Sale Incentive Program award only if the Debtors consummate a sale of the hardware and biomaterials business that generates more than $5,000,000 in proceeds or a sale of the digital health business. The Executives will be required, as outlined above, to make substantial efforts to achieve the goals in the Sale Incentive Program while continuing to operate the Debtors' business. Simply put, the goals in the Sale Incentive Program are challenging, with no guaranteed awards. *Cf. Dana Corp.*, 358 B.R. at 583; *Hawker*

*Beechcraft*, 479 B.R. at 313 n.7. Accordingly, the Debtors respectfully submit that sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code do not apply to the Sale Incentive Program, and the Sale Incentive Program constitutes an appropriate incentive plan.

### B. The Sale Incentive Program Satisfies the Requirements of Section 503(c)(3) of the Bankruptcy Code.

29. The Sale Incentive Program is also appropriate under section 503(c)(3) of the Bankruptcy Code, which prohibits certain transfers made to officers, managers, consultants, and others that are both outside the ordinary course of business and not justified by the facts and circumstances of the case. 11 U.S.C. § 503(c)(3). In applying this section, one court noted that the "test in section 503(c)(3) appears to be no more stringent than one courts must apply in approving any administrative expense under section 503(b)(1)(A) . . . [an] expense must be an actual, necessary cost, or expense of preserving the estate." *Dana Corp.*, 358 B.R. at 576; *see also In re Global Home Prods., LLC*, 369 B.R. 778, 783 (Bankr. D. Del. 2007) (noting that a review under section 503(c)(3) of the Bankruptcy Code, as opposed to section 503(c)(1), "utilizes the more liberal business judgment review under § 363").

30. Further, courts that have analyzed section 503(c)(3)'s prohibition on "other transfers" typically have utilized the standard applied under section 363(b) of the Bankruptcy Code. Specifically, transfers are approved if they are a sound exercise of a debtor's business judgment and warranted by the facts and circumstances of the case. *See Global Home Prods.*, 369 B.R. at 783; *Velo Holdings*, 2012 WL 2015870, at *9 ("Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b).").

31. In a widely reported decision, the court in *Dana Corp.* set forth six factors to consider in determining whether an incentive plan is appropriate under section 503(c)(3):

13

(a) whether the plan is calculated to achieve the desired performance; (b) whether the cost of the plan is reasonable in the context of a debtor's assets, liabilities, and earning potential; (c) whether the scope of the plan is fair and reasonable or discriminates unfairly among employees; (d) whether the plan is consistent with industry standards; (e) whether the debtor performed due diligence in investigating the need for the plan; and (f) whether the debtor received independent counsel in performing due diligence, creating, and authorizing the plan. *See Dana Corp.*, 358 B.R. at 576-77. These factors are not exhaustive elements required for approval of an incentive plan; rather, they are to be considered as a court evaluates the totality of the circumstances related to an incentive plan. *See id.* at 576. 54.

32. As set forth below, the Sale Incentive Program is fully justified by the facts and circumstances of these chapter 11 cases and, therefore, satisfies the requirements of section 503(c)(3) of the Bankruptcy Code and the standard set forth in *Dana Corp.*:

- ***The Sale Incentive Program Is Structured to Achieve the Desired Performance***. The Sale Incentive Program incentivizes the Debtors' leadership team to drive a successful sale process. Achievement of the sale metrics will require substantial efforts from the Executives during these challenging times. The Executives have been asked to deliver far more than is ordinarily required of them. "[S]imply showing up" will not result in achievement of the sale metrics, and, therefore, no award will be earned without substantial outperformance by the Executives.

- ***The Debtors Developed the Sale Incentive Program with Independent Advice and Oversight***. The Independent Directors actively sought input from the Debtors' legal and financial consultants during the Sale Incentive Program development process. This process included A&M's compensation-related expertise.

- ***The Debtors Were Duly Diligent***. The Independent Directors, with the assistance of their advisors, performed considerable diligence on the Executives' existing compensation levels (both with and without some form of incentive-based compensation) and market comparables and developed the Sale Incentive Program to properly incentivize the three employees critical to realizing the maximum value for the Debtors' assets in a chapter 11 marketing and sale process.

- ***The Scope of the Sale Incentive Program Is Fair and Reasonable***. The Executives were carefully selected and limited to a set of three of the most senior individuals at the Debtors who drive performance and are critical to ensuring

14

a successful outcome to the marketing process. The Sale Incentive Program is reasonably limited to key employees whose efforts are absolutely critical to these chapter 11 cases and its cost is reasonable in comparison to the Sale Incentive Program.

- ***The Cost of the Sale Incentive Program Is Reasonable***. The Sale Incentive Program's proposed cost is reasonable, market-based, and consistent with award opportunities approved in comparable chapter 11 cases.

33. Based on the foregoing, the Debtors respectfully submit that the Sale Incentive Program is a proper exercise of their business judgment and a proper use of the Debtors' resources, is justified by the facts and circumstances of these chapter 11 cases, and, therefore, satisfies the requirements of section 503(c)(3) of the Bankruptcy Code. The Debtors believe that the Sale Incentive Program will motivate the participants to the ultimate benefit of all parties in interest in these chapter 11 cases and should be approved.

34. Section 503(c)(3) is satisfied and the Sale Incentive Program should be approved as a sound exercise of the Debtors' business judgment.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

35. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Reservation of Rights

36. Nothing contained in this Motion nor any action taken pursuant to the relief requested herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any claim is of a

type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a waiver of any claim or cause of action that may exist against any creditor or interest holder; (f) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (g) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to this Motion are valid and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended and should not be construed as an admission as to the validity or priority of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## Notice

37. The Debtors will provide notice of this Motion to: (a) the United States Trustee for the Southern District of Texas; (b) Pachulski Stang Ziehl & Jones LLP, as proposed counsel to the Committee; (c) the United States Attorney's Office for the Southern District of Texas; (d) the state attorneys general for the states in which the Debtors operate; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Bankruptcy Local Rule 9013-1(d). In light of the nature of the relief requested, no other or further notice need be provided.

The Debtors request that the Court enter the Order granting the relief requested in this Motion and such other and further relief as the Court deems appropriate under the circumstances.

Houston, Texas
July 4, 2023

/s/ *J. Machir Stull*

| | |
|---|---|
| **JACKSON WALKER LLP** | **WHITE & CASE LLP** |
| Veronica A. Polnick (TX Bar No. 24079148) | Gregory F. Pesce (admitted *pro hac vice*) |
| J. Machir Stull (TX Bar No. 24070697) | Laura E. Baccash (admitted *pro hac vice*) |
| Matthew D. Cavenaugh (TX Bar No. 24062656) | 111 South Wacker Drive, Suite 5100 |
| 1401 McKinney Street, Suite 1900 | Chicago, Illinois 60606 |
| Houston, Texas 77010 | Telephone: (312) 881-5400 |
| Telephone: (713) 752-4200 | Email: gregory.pesce@whitecase.com |
| Email: vpolnick@jw.com | laura.baccash@whitecase.com |
| mstull@jw.com | |
| mcavenaugh@jw.com | Charles Koster (TX Bar No. 24128278) |
| | 609 Main Street, Suite 2900 |
| *Proposed Co-Counsel to the Debtors and* | Houston, Texas 77002 |
| *Debtors in Possession* | Telephone: (713) 496-9700 |
| | Email: charles.koster@whitecase.com |
| | |
| | Barrett Lingle (admitted *pro hac vice*) |
| | 1221 Avenue of the Americas |
| | New York, New York 10020 |
| | Telephone: (212) 819-8200 |
| | Email: barrett.lingle@whitecase.com |
| | |
| | *Proposed Counsel to the Debtors and* |
| | *Debtors in Possession* |

**<u>Certificate of Service</u>**

  I certify that on July 4, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                  <u>/s/ *J. Machir Stull*</u>
                  J. Machir Stull