```
               UNITED STATES BANKRUPTCY COURT
             SOUTHERN DISTRICT OF TEXAS (HOUSTON)

                                .  Case No. 23-90731
IN RE:                          .  Chapter 11
                                .  (Jointly Administered)
SURGALIGN HOLDINGS, INC.,       .
et al.,                         .  515 Rusk Street
                                .  Houston, TX 77002
                   Debtors.     .
                                .  Thursday, August 10, 2023
. . . . . . . . . . . . . . . . .  4:21 p.m.
```

```
 TRANSCRIPT OF ORDER (I) AUTHORIZING AND APPROVING THE SALE OF
   CERTAIN OF THE DEBTORS' DIGITAL HEALTH BUSINESS ASSETS TO
     AUGMEDICS, INC. FREE AND CLEAR OF ALL LIENS, CLAIMS,
    ENCUMBRANCES, AND INTERESTS; (II) AUTHORIZING THE SALE
     TRANSACTION; AND (III) GRANTING RELATED RELIEF [338]
          BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
            UNITED STATES BANKRUPTCY COURT JUDGE
```

TELEPHONIC APPEARANCES:

For the Debtors:

```
                        White & Case LLP
                        By:  GREGORY F. PESCE, ESQ.
                        111 South Wacker Drive, Suite 5100
                        Chicago, IL 60606-4302
                        (312) 881-5400

                        White & Case LLP
                        By:  SAMUEL P. HERSHEY, ESQ.
                        1221 Avenue of the Americas
                        New York, NY  10020-1095
                        (212) 819-8200
```

TELEPHONIC APPEARANCES CONTINUED.

Audio Operator:         Courtroom ECRO Personnel

Transcription Company:  Access Transcripts, LLC
                        10110 Youngwood Lane
                        Fishers, IN 46048
                        (855) 873-2223
                        www.accesstranscripts.com

     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
TELEPHONIC APPEARANCES (Continued):

For the Debtors:
                        Jackson Walker LLP
                        By:  VERONICA POLNICK, ESQ.
                        1401 McKinney Street, Suite 1900
                        Houston, TX 77010
                        (713) 752-4200
For the Official        Pachulski Stang Ziehl & Jones LLP
Committed of Unsecured  By:  ROBERT J. FEINSTEIN, ESQ.
Creditors:              70 Third Avenue, 34th Floor
                        New York, NY  10017-2024
                        (212) 561-7700

For SNH Medical Office
Properties Trust:       Goulston & Storrs PC
                        By:  PETER BILOWZ, ESQ.
                        400 Atlantic Avenue
                        Boston, MA  02110
                        (617) 482-1776

For Augmedics, Inc.:
                        Law Office Of Nathan A. Schultz
                        By:  NATHAN SCHULTZ, ESQ.
                        10621 Craig Road
                        Traverse City, MI  49686
                        (310) 429-7128

For Surgical Theater,
Inc.:                   Chamberlain Hrdlicka
                        By:  JARROD MARTIN, ESQ.
                        1200 Smith Street, Suite 1400
                        Houston, TX  77002
                        (713) 356-1280

                        Taft Stettinius & Hollister LLP
                        By:  MICHAEL O'NEIL, ESQ.
                        One Indiana Square, Suite 3500
                        Indianapolis, IN 46204-2023
                        (317) 713-3561

Also Present:
                        JAMES GARRETT, ESQ.

                        KEVIN HYKES

                        JEFF WETHERITE

                        GEORGE VARUGHESE
```

INDEX
8/10/23

| WITNESS<br>FOR THE DEBTORS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| George Varughese | 11 | -- | -- | -- |

| EXHIBITS | ADMITTED |
|---|---|
| ECF Numbers 334-9 and 334-10 | 10 |

 1       (Proceedings commence at 4:21 p.m.)

 2         THE COURT:  Okay.  Good afternoon, everyone.  This is

 3   Judge Lopez.  Today is August the 10th.  I'm going to call

 4   Surgalign, 23-90731, continuation of a sale hearing.  There's

 5   about -- now, the courtroom is empty, but there's about -- a

 6   little over 60 people on the line.  I'm just going -- I'm going

 7   to start to -- a number of parties have hit "five star".

 8   Again, I'm going to ask that you please make an electronic

 9   appearance, and we'll see where this goes.  I'm just going to

10   unmute the line in the order in which I see them.  First is a

11   646 number.

12         MR. VARUGHESE:  Your Honor, can you hear me?

13         THE COURT:  Just fine.

14         MR. VARUGHESE:  Okay.  This is George Varughese,

15   Alvarez & Marsal.

16         THE COURT:  Okay.  Good afternoon, sir.

17         Here's a 330 number.

18         MR. WITHERITE:  Jeff Witherite, Surgical Theater.

19         THE COURT:  Good.  Okay.  Good afternoon, sir.

20         310 number?

21         MR. WITHERITE:  Thank you.

22         THE COURT:  Mr. Schultz, that -- there's a 310 with a

23   4 number in there.  You may have muted.

24         MR. SCHULTZ:  Yes, I apologize.  It should be okay

25   now, Your Honor.

1          THE COURT:  Just fine.

2          MR. SCHULTZ:  Nathan Schultz on behalf of Augmedics,

3    Inc.  Also with us on the line are the CEO, Kevin Hykes and the

4    outside general counsel, James Garrett.

5          THE COURT:  Okay.  The reason I knew this I do it all

6    the time.  Hold on.

7          617 number?

8          MR. BILOWZ:  Good afternoon, Your Honor.  Peter

9    Bilowz on behalf of SNH Medical Office Properties Trust.

10         THE COURT:  Okay.  A 312 number?

11         MR. PESCE:  Good afternoon, Your Honor.  Gregory

12   Pesce, White & Case, on behalf of the debtors.

13         THE COURT:  Good afternoon.

14         Alrighty, the 917 number?

15         MR. FEINSTEIN::  Good afternoon, Your Honor.  Robert

16   Feinstein, Pachulski Stang Ziehl & Jones, proposed counsel for

17   the Committee.

18         THE COURT:  Alrighty.  914 number?

19         MR. HERSHEY:  Good afternoon, Your Honor.  Sam

20   Hershey from White & Case for the debtors.

21         THE COURT:  Alrighty.  832 number?  Good afternoon.

22         MR. MARTIN:  Good afternoon, Your Honor.  Jarrod

23   Martin on behalf of Surgical Theater.  Also with me is my

24   co-counsel Michael O'Neil and Jeff Witherite, the Surgical

25   Theater corporate representative.

```
 1              THE COURT:  Okay.  Good afternoon, Mr. Martin.

 2              MR. MARTIN:  Good afternoon.

 3              THE COURT:  631 number?

 4              MS. POLNICK:  Good afternoon, Your Honor.  Veronica

 5   Polnick, appearing on behalf of the debtors.

 6              THE COURT:  Okay.  Good afternoon, Ms. Polnick.

 7              Anyone else, please hit "five star."  I'm going to

 8   kind of do a going once, going twice, and then I'm going to

 9   turn it over to debtors' counsel.

10              Okay.  I'm turning it over to debtors' counsel.

11              MR. PESCE:  Thank you, Your Honor.  Again, Gregory

12   Pesce, White & Case, proposed counsel to the debtors.  We

13   appreciate Your Honor making a time for us this afternoon for

14   the continued sale hearing for the debtors' digital assets.

15              Just rewinding the tape here a little bit, going into

16   our prior hearing, the debtors were seeking to approve a post-

17   auction bid that we received from Surgical Theater.  As we

18   talked -- discussed in our reply that we filed earlier today,

19   and at Docket 336, we believe that under the fiduciary-out, it

20   was permissible and appropriate for us to proceed -- to pursue

21   that bid.  But the debtors also take to heart the Court's

22   comments at the hearing.

23              And this is a case that's somewhat unusual in that we

24   don't have any secured creditors.  We only have our creditors'

25   committee.  And after the hearing, we discussed the matter at
```

1 length with our committee to obtain their feedback.  And we

2 also engaged with our prior lead bidder, Augmedics.

3          And as a result of all those conversations, Augmedics

4 confirmed to the debtors, importantly, that they would stand by

5 a proposed bid of $1.5 million in cash.  They also completed

6 some remaining ancillary documents which had not yet been

7 completed as of the sale hearing.  With those developments

8 having occurred, and with our committee supporting the

9 decision, the debtors determined that, in lieu of continued

10 litigation with Augmedics over the bid, that we would pivot

11 back to Augmedics in light of its improved offer and seek to

12 approve that proposal at today's hearing.  After making that

13 determination, we informed Mr. Martin and Mr. Martin's clients

14 of that decision.  As Your Honor may have seen earlier today,

15 as we briefly touched upon in our reply, Mr. Martin's clients

16 filed on the docket a further modified bid of $2 million.

17          And you know, while the debtors are sort of paying to

18 be in a position like this, we've conducted a very broad,

19 robust process.  That process led us to Augmedics, and we

20 subsequently were able to further enhance that proposal.  And

21 we believe very strongly that that process was very -- was

22 sound and robust.  And with -- in consultation with the

23 Committee, we understand the Committee's preference is for us

24 to proceed with the existing Augmedics bid and bring this

25 matter to closure.

1          So for the rest of today's hearing, the principal

2    thing that we're going to do is we're going to present

3    Mr. Varughese as our witness in support of the Augmedics bid,

4    to talk about the sale process that led to us -- led to the

5    auction and then the subsequent developments there.  And then,

6    to the extent there are any actual objections, we can discuss

7    that in argument afterwards.

8          I think the only lantern I might hang here for the

9    Court is that prior to today's hearing, we finalized the APA

10   and the ancillary documents that are expressly contemplated by

11   the purchase agreement with Augmedics to our satisfaction and

12   the Committee's satisfaction.  Earlier today, it became clear

13   that Augmedics may need some transition services from the

14   debtors through approximately September 15th.  We have not yet

15   signed a transition services agreement with Augmedics, and the

16   debtors don't believe that a transition services agreement

17   necessarily has to be finalized prior to the closing.

18          We believe we can meet our obligations to Augmedics

19   under the purchase agreement at the closing.  All that being

20   said, we may be before Your Honor in the not too distant future

21   to seek approval of a transition services agreement if

22   Augmedics continues to require those services.

23          Most importantly, we just want to -- in addition to

24   making sure the sale happens, we want to make sure that, if

25   Augmedics does require any services, the debtors are going to

1   be reimbursed and compensated for those services; and to the

2   extent any employees who are not currently being retained by

3   the debtors under the KERP program Your Honor approved that we

4   deal with that contingency.  That's a long way of saying that

5   that is not a matter for today.  But I just want to put that on

6   the Court's radar that this may be something that we seek

7   approval for in the not-too-distant future.  But given that it

8   just came up today, it's not something we're doing today.

9          And to be clear, it is not required by our purchase

10  agreement.  The debtors are ready to close as soon as possible

11  after the sale hearing with Augmedics transaction.  And that --

12  that's really something that's sort of a -- for the future, if

13  need be.

14         So with that, I'm going to -- I plan to hand it to my

15  partner, Sam Hershey, who's going to present Mr. Varughese from

16  A&M, who is the lead investment banker for Alvarez & Marsal, to

17  pursue -- or to provide a -- direct testimony and the extent

18  any parties wish to cross examine him or the Court has

19  questions, he'll obviously entertain and answer those

20  questions.

21         So before handing it -- the virtual podium to

22  Mr. Hershey, I'll pause and see if Your Honor has any questions

23  or requests that we proceed.

24         THE COURT:  Nope, no questions.  I think today -- and

25  I appreciate the update.  I think today we said we were going

1  to get right into it, so let's do.

2           MR. HERSHEY:  Great.

3           THE COURT:  All right.  Mr. --

4           MR. HERSHEY:  Good afternoon, Your Honor.

5           THE COURT:  Mr. Hershey, I just -- perfect.

6           MR. HERSHEY:  Oh, sorry, Your Honor.

7           THE COURT:  No, no, I can hear you just fine.  I just

8  wanted to confirm that I could hear you.  Okay.

9           MR. HERSHEY:  Great.

10          THE COURT:  How do you wish to proceed, Counsel?

11          MR. HERSHEY:  Thank you, Your Honor.  Sam Hershey

12  from White & Case for the debtors.

13          So, Your Honor, before I call Mr. Varughese to the

14  stand, I do want to note that at the last hearing, we admitted

15  eight exhibits into evidence.  Those are at Docket Number 317,

16  1 through 8.  Earlier today, we filed an amended exhibit list

17  that includes two additional exhibits.  Those are at Docket

18  Number 334-9 and -10.  And so I'd like to move those two

19  documents into evidence before calling the witness, if I may.

20          THE COURT:  Any objection?

21          Okay.  They're admitted.

22      (ECF Numbers 334-9 and 334-10 admitted into evidence)

23          MR. HERSHEY:  Thank you, Your Honor.  With that, the

24  debtors would request to call Mr. Varughese to the stand.

25          THE COURT:  Okay.  Mr. Varughese, can you raise your

1  right hand, sir?

2              GEORGE VARUGHESE, DEBTORS' WITNESS, SWORN

3              THE COURT:  Okay.  I'm going to ask just to confirm

4  that you have no notes in front of you, and if any documents

5  are shown, we'll put them up on the screen so that you can see

6  them, we can all see it at the same time.  Is that okay?

7              THE WITNESS:  That -- that's okay.  I do have notes

8  in front of me, but I will not look at them.  Thank you.

9              THE COURT:  Okay.  I want you to put them -- just put

10  them to the side so that you're -- we're all comfortable.

11             THE WITNESS:  Yes.

12             THE COURT:  And I would also note that parties may,

13  you know, object, and I would just ask that you give me an

14  opportunity to resolve the objection.  Okay?

15             THE WITNESS:  Thank you.

16             THE COURT:  Mr. Hershey, you may proceed.

17             MR. HERSHEY:  Thank you, Your Honor.

18                        DIRECT EXAMINATION

19  BY MR. HERSHEY:

20  Q    Mr. Varughese, good afternoon.  Welcome back to the

21  witness stand.

22  A    Good afternoon.

23  Q    Now, Mr. Varughese, at the last hearing, you testified

24  regarding the marketing and sale process in connection with the

25  debtors' hardware assets.  I want to turn now to the digital

 1  assets.  Can you describe the marketing process in connection

 2  with those assets?

 3          THE WITNESS:  Your Honor, I am hearing some

 4  background noise.

 5          THE COURT:  Yeah, I found who it was.  Mr. Hershey,

 6  can you still -- I want to make sure I didn't mute you by

 7  accident.  Oh, I think I did.  Darn, it.  Hit "five star"

 8  again, Mr. Hershey.

 9          THE WITNESS:  Okay.  Thank you.

10          THE COURT:  Just a second.  Hold on a second,

11  Mr. Varughese.  Hold on a second, I got it.

12          THE WITNESS:  Oh, I'm sorry.

13          THE COURT:  I was hearing some back noise as well,

14  and I thought I caught the right back noise party, but I

15  didn't.  I think I muted your lawyer.  You're not going to be

16  able to answer any questions.

17          Alrighty, folks, again, we're still conducting live

18  court.  Thank you.  I apologize.

19          Mr. Hershey, why don't you ask the question again so

20  we can have a clean record?

21          MR. HERSHEY:  Of course.  Can Your Honor hear me

22  okay?

23          THE COURT:  Just -- yes.  Now, I can.  And I know who

24  you are.

25          MR. HERSHEY:  Perfect.

1           THE COURT:  On this line again, so and I --

2           MR. HERSHEY:  Excellent.  Thank you, Your Honor.

3  BY MR. HERSHEY:

4  Q    So, Mr. Varughese, at the last hearing, you described in

5  your testimony the marketing and sale process in connection

6  with the debtors' hardware assets.  I want to turn now to the

7  digital assets of the debtors.  Can you describe the marketing

8  process in connection with those assets?

9  A    Yes.  For context, as Mr. Pesce observed last time, I just

10  want to make sure that everybody's aware, the digital assets is

11  a pre-revenue business.  It's largely based on some artificial

12  intelligence technology.  It is losing money, and by our

13  estimate, it requires another $30 million or so to get it to a

14  break-even status.  So, given those features of the business,

15  we did not emphasize the marketing of this before the filing of

16  the bankruptcy to find a stalking horse.  As everybody knows,

17  we found Xtant for the hardware assets.

18      And once we filed the bankruptcy, we then -- we then

19  proceeded -- we then proceeded to start the marketing for the

20  digital assets.  We developed a buyer list, which consisted of

21  several different types of buyers:  private equity firms,

22  venture capital firms, portfolio companies of private equity

23  firms, and strategic companies, strategic partners who are

24  already in the -- in the business.  We then consulted with the

25  management team of the company, and they had several comments

Varughese - Direct                                    14

1   which we incorporated.  We also consulted with the financial

2   advisor to the unsecured creditor committee, who also had some

3   comments, which we incorporated.  In all, we had a list of over

4   515 parties.

5        And I do want to make one point here:  Some of these were

6   parties who were also interested in the hardware.  So it's

7   difficult to unbundle those, given that both the hardware and

8   the digital really work with the same type of -- same type of

9   business.  So what I'm talking about is a -- is a list that

10  might encompass people who also had an interest in the

11  hardware.

12       So over 550 parties that were contacted.  Eventually, 11

13  parties signed an NDA who had an interest just in the digital

14  assets.  We get them -- got them into the data room, answered

15  their questions.  And at the end of the day, at the deadline

16  for the bid, two bids were received, one from Brainlab at

17  $150,000 and one from Augmedics at $250,000.

18  Q    Thank you.  And what happened at the debtors' auction with

19  respect to the digital assets?

20  A    So we started the auction with the -- the two parties I

21  mentioned, Brainlab and Augmedics.  We started with the

22  Augmedics bid of $250,000, and in increments of $50,000.  There

23  were multiple rounds.  Eventually, the final bid was from

24  Augmedics at $900,000, so we declared them the winner of the

25  auction at that price, and we declared Brainlab as the backup

1    bidder at $850,000.

2    Q    Now, as the Court is aware from the last hearing,

3    following the auction, another bidder called Surgical Theater

4    came forward with a topping bid of $1.5 million.  Was Surgical

5    Theater one of the parties that A&M contacted in connection

6    with the debtors -- with marketing the debtors' digital assets?

7    A    No.

8    Q    Why not?

9    A    Well, Surgical Theater is a small company.  It is a

10   private company.  I understand it has revenues of less than

11   $50 million.  It's a company that we had not heard of before, a

12   company that management had not heard of before, and it's also

13   one that the advisors to the UCC had not heard of before.  I do

14   know that they're attending the hearing, and I want to

15   emphasize that there was no disrespect intended, but in --

16   sometimes in large processes like this, some small companies do

17   get missed, and that was the reason.

18   Q    And I -- you sort of hinted at this in your last answer,

19   but I just want to be really clear for the Court:  To your

20   knowledge, did anyone from the debtors or their advisors

21   contact Surgical Theater regarding the sale of the debtors'

22   digital assets?

23   A    No.

24   Q    Okay.  So by the time Surgical Theater came forward, the

25   debtors already had a winning bid at auction from Augmedics.

1  What made you believe that you could engage with Surgical

2  Theater regarding a potential topping bid?

3  A    Well, this -- this was a difficult issue for us because we

4  had a lot of discussion between us and White & Case and the

5  management.  On the one hand, there was the sanctity of the

6  process.  We -- there was an auction, there was a winner, and

7  they played by the rules, and -- and that was that.  On the

8  other hand, we felt that we had a fiduciary responsibility to

9  maximize the value of the assets and maximize the recovery for

10 the creditors.

11      When -- after multiple conversations with Surgical Theater

12 when they approached us, we determined that that -- they had

13 the financial capacity and the skill set to make a bid that

14 would be a meaningful improvement over the Augmedics' winning

15 bid.  And we felt we had no choice but to listen to them and

16 entertain their bid.

17 Q    And in addition to the duties you're describing, did you

18 believe that you had the right, under the rules provided by the

19 Court, to consider that bid?

20 A    We did, yes.

21 Q    Okay.  So let me actually -- I'd like to turn your

22 attention to Committee Exhibit Number 5, which is at

23 Docket Number 317-5.

24      MR. HERSHEY:  And if I may, I'd like to ask the Court

25 to give presenter rights to Ms. Polnick, who will pull this up

```
 1   for the witness to see.

 2           THE COURT:  Alrighty.

 3           UNIDENTIFIED:  I'm sorry.  Counsel said that's a

 4   committee exhibit or is it a debtor exhibit?

 5           MR. HERSHEY:  I'm sorry.  Debtor exhibit.

 6           UNIDENTIFIED:  Thank you.

 7           MR. HERSHEY:  I -- I'm in judge -- I'm in front of

 8   Judge Lopez in another case where I represent the committee, so

 9   I had a momentary confusion there.  Yes, debtor exhibit.  Thank

10   you.

11           Okay.  And actually, Ms. Polnick, why don't we just

12   go to the top first, just so I can make sure Mr. Varughese has

13   seen this document before.  Okay.

14   BY MR. HERSHEY:

15   Q   So, Mr. Varughese, take a second and look at this.  And

16   then if you could let me know if you've seen this document

17   before.

18   A   I have.

19   Q   Have you reviewed it?

20   A   Yes.

21   Q   Okay.

22           MR. HERSHEY:  So now we can go, Ms. Polnick, to PDF,

23   Page 35.  And can we actually -- can we zoom in a bit on 17?

24   Thank you very much.  Okay.

25   BY MR. HERSHEY:
```

1   Q    Mr. Varughese, you see Section 17 here?

2   A    Yes.

3   Q    And you see the title of the section is "Fiduciary

4   Duties"?

5   A    Yes.

6   Q    Okay.  so I'm just going to read this for you and read it

7   into the record.  "Notwithstanding anything to the contrary in

8   these bid procedures, nothing in these bid procedures shall

9   require the debtors, after consulting with counsel, to take any

10  action or refrain from taking any action with respect to any

11  potential transaction, if taking or failing to take such action

12  would be inconsistent with applicable law or their fiduciary

13  duties."  Do you see that?

14  A    Yes, I do.

15  Q    And you see that the next line says, "The debtors maintain

16  their right to exercise their fiduciary-out at any time prior

17  to the entry of the sale order".  See that?

18  A    I do.

19  Q    Okay.  Mr. Varughese, are these two sentences consistent

20  with what your understanding was of the debtors' fiduciary-out

21  that you mentioned in your testimony?

22  A    It is.

23  Q    Okay.

24       MR. HERSHEY:  Thank you, Ms. Polnick.  We can take it

25  down.

1  BY MR. HERSHEY:

2  Q    Okay.  Mr. Varughese, let's fast-forward to today.  The

3  Court is aware, of course, that the last hearing, Augmedics,

4  agreed to raise its bid to $1.5 million.  What, if anything,

5  has Surgical Theater done since the last hearing?

6  A    So as the Court is aware, in one of the breaks that was

7  taken at the last hearing, Surgical Theater indicated that --

8  that they would be willing to move their bid up to

9  $1.65 million.  And then yesterday, they let -- informed us

10 that that -- they would be improving the bid further, to

11 $2 million.

12 Q    And -- okay.  So just -- I just want to make sure it's

13 crystal clear for the record, so am I correct in understanding

14 the debtors now have two bids for their digital assets?  They

15 have one bid from Augmedics for $1.5 million and one bid from

16 Surgical Theater for $2 million.  Is that correct?

17 A    Correct.

18 Q    Was there any other component to either party's bids

19 that's worth raising to the Court's attention?

20 A    Yes.  Surgical Theater had -- had said that that -- they'd

21 be willing to take at least three employees, and maybe more, of

22 the company's digital business.

23 Q    Okay.  So with those two bids before it, which bid is the

24 company moving forward with -- or seeking to move forward with

25 today?

1   A    We are seeking to move forward with the bid from Augmedics

2   at $1.5 million.

3   Q    And why is the company seeking to move forward with that

4   bid?

5   A    So this also has been a difficult question.  Several

6   things influenced our decision on this.  First and foremost, as

7   Mr. Pesce pointed out in his opening comments, there is no

8   secured debt here.  All that we are doing here in maximizing

9   value is for the benefit of the unsecured creditors.

10        And I -- I believe Mr. Feinstein was -- was -- was

11   speaking at the last hearing.  Our interpretation of that was

12   that he was not banging the table to tell us that -- that you

13   got to go get the last dollar or the highest bid.  So that was

14   one thing that influenced us.

15        The second is, Your Honor, we -- we heard you clearly.

16   You clearly put a premium on the value of the sanctity of the

17   process, the integrity of the process, and that was very clear

18   to us.

19        And the third thing is, this is a small company.  We are

20   losing money every day.  We are eroding our cash.  And this --

21   this hearing and other things are very expensive.  We really

22   want to get to a conclusion quickly and move on.  So our

23   feeling, after thinking about all of these, is that -- the --

24   the best and the experienced solution here is to move forward

25   with the Augmedics bid of $1.5 million.

```
 1              MR. HERSHEY:  Thank you, Mr. Varughese.

 2              I have no further questions, Your Honor.

 3              THE COURT:  Okay.  Let me ask, does anyone who

 4   supports the relief requested wish to ask this witness any

 5   questions?  And again, if you need to hit "five star", I'm just

 6   checking now.

 7              Okay.  Anyone wish to cross-examine the witness?

 8   Again, if you wish to ask questions or if you need me, just

 9   please hit "five star".

10              Okay.  Alrighty.  Thank you.

11              THE WITNESS:  Thank you, Your Honor.

12         (Witness excused)

13              THE COURT:  Okay.  Anyone else?

14              Mr. Hershey, I think it's probably best for me to

15   turn it back over to you.

16              MR. HERSHEY:  Thank you, Your Honor.  The debtors

17   have no further witnesses or evidence, and so we will rest.  I

18   don't know if any other party wishes to submit evidence or a --

19              THE COURT:  Okay.  Let me -- let's find out:  Does

20   anyone who supports the relief requested have any additional

21   evidence they wish to present to the Court?

22              Okay.  Does anyone who opposes the relief requested

23   or -- wish to address the Court or present any evidence?

24              MR. MARTIN:  Your Honor, this is Jarrod Martin for

25   Surgical Theater.
```

1          THE COURT:  Yes, sir?

2          MR. MARTIN:  I'm kind of in an interesting spot

3   because my clients neither supporting the relief requested nor

4   objecting to the relief requested.  And in fact, I'm not

5   certain we have standing to object to a sale when we're not a

6   creditor.

7          But that being said, I did want to let the Court know

8   that to the extent the Court has any questions specifically for

9   Mr. Witherite, he's available.  The Court made some comments at

10  the last hearing that he was -- that you were concerned about

11  what Mr. Witherite knew or didn't know.  And I didn't want the

12  Court to think we were trying to hide him as a witness.  So

13  he's still available to the extent the Court has any questions.

14         But I am not -- I have no burden of proof in this

15  hearing.  I have no case in chief to put on.  And so I'm not

16  presenting him as a witness, but he is available to the Court

17  for questions.

18         THE COURT:  Perfect.  Thank you very much.

19         MR. MARTIN:  Thank you, Judge.

20         THE COURT:  Okay.  Anyone else?

21         Okay.  Mr. Hershey and Mr. Pesce, maybe I turn things

22  back over to you.

23         MR. PESCE:  Thank you.  For the record, Gregory

24  Pesce, White & Case, proposed counsel to the debtors.  The --

25  with the evidence closed, I'll just make a few final comments

1   here because I'm pleased to see that there's no objections that

2   have been filed, and I'm not aware of any objections to the

3   sale.

4          So maybe just quickly, in summary here, the debtors,

5   as we talked about at the first hearing, and every successive

6   hearing, commenced these cases to run a sale process.  We set

7   up a strong process to maximize value that resulted already in

8   the approval, and we're in the process of closing the hardware

9   sale.  And we're now on the precipice of hopefully obtaining

10  approval of the digital sale so we can quickly consummate that.

11         The sale here is a clear exercise of the debtors'

12  business judgment.  While the circumstances of this hearing are

13  somewhat unique, the results here are also very unique.  We

14  came here with a bid of $900,000, and we now have a bid that's

15  materially higher, from that same bidder, of $1.5 million and

16  the prospect of being able to close this sale very quickly.

17         That's particularly notable in light of the fact, as

18  our witness testified, this business is not making money.  It's

19  costing the company money every day.  And it'll take upwards of

20  $30 million to even hit break-even.  No one was willing to

21  invest in the company before bankruptcy and no one was willing

22  to invest in the company after bankruptcy to fund that, and the

23  sale is literally the only option that we have here.

24         We've fully complied with our obligations and duties

25  under the bidding procedures order, and in -- to that end have

1  been in regular contact with our creditors' committee, which I

2  understand fully supports our sale here, was present at the

3  auction, and has been consulted literally every day.

4  Mr. Sandler and Mr. Feinstein, both, and the rest of their team

5  for the, you know, better part of a week and a half here as

6  these more recent developments have come up.

7           So with that said, we don't have any further

8  argument.  We're happy to take any questions that the Court

9  might have prior to seeking entry of bidding procedures order.

10 And with that, I'll stop.

11          THE COURT:  Okay.  Does anyone else wish to be heard?

12          UNIDENTIFIED:  Your Honor --

13          MR. FEINSTEIN:  Thank you, Your Honor.  May I --

14 sorry.

15          THE COURT:  I guess I ought to say anyone who

16 supports the relief requested wish to be heard?  Anyone?

17          MR. FEINSTEIN:  I guess that would be me, Your Honor.

18 Again, for the record, Robert Feinstein for the Committee.  So,

19 Your Honor, we certainly agree with the observations Mr. Pesce

20 made.  This is a difficult and painful situation because I

21 think it's clear that it -- had SPI been alerted to the sale

22 prospect before the auction, we might have had a spirited

23 auction, we might have had a better purchase price.  And

24 that -- that's really unfortunate.  But we also respect the

25 process and we respect that Augmedics had a right to rely on

1   the bid procedures order.  And they went above and beyond the

2   call of duty, in my opinion, because they didn't need to raise

3   their bid from 900,000 to a million five.  They could have

4   stood pat and said, that was our -- announced as a winning bid,

5   and they could have contested any effort to sell to another

6   bidder.

7           They also could have appealed.  And I don't want to

8   minimize that prospect because the delay in the closing of the

9   sale with an appeal, that occasion, would cause the estate to

10  lose more money.  And then there's the cost of the appeal

11  itself, because you've got debtors' professionals, the

12  Committee's professionals, charging the estate for the

13  appellate process.  And I know, again from the Line Tree

14  (phonetic) experience that the disappointed late bidder

15  there -- or disappointed original bidder appealed on a state

16  pending appeal.  There were a lot of proceedings.

17          So given that the increment here is 500,000, that

18  could very easily be chewed up by operating losses, by

19  professional fees associated with the appeal.  It's also

20  conceivable Augmedics would have made a claim for some kind of

21  administrative expense, like a breakup fee, if they were

22  disappointed in the process.  So after synthesizing all those

23  things and giving us a lot of careful thought, we come out

24  where we are, which is supporting the sale to Augmedics for a

25  million-five.

1          I did hear along the way, and I don't know if it's

2   still operative, that SPI was prepared to be a backup bidder at

3   1.3 million.   That preceded their filing their new bid today

4   (indiscernible).   I don't know if that's still the case.   It's

5   always good to have a backup bidder.   I mean, we did have a

6   different backup bidder, I guess, at 850.   We would like

7   clarity on that.

8          But to be clear, Your Honor, we do support the sale

9   to Augmedics at 1.5 million.

10          THE COURT:   Thank you.

11          Mr. Martin, did you wish to speak?

12          MR. MARTIN:   Yes, Your Honor.   Just a few words, if

13   you don't mind.

14          THE COURT: Sure.

15          MR. MARTIN:   Again, like I said previously, we're not

16   objecting to the relief requested, but we're not supporting the

17   relief requested.   We're still very much interested in the

18   assets, but understand and appreciate the difficult position

19   that this puts the debtors and the UCC in.   But I hope that

20   they can take solace that SCI's involvement in the process to

21   date has provided value to the estate in at least $600,000 in

22   what we viewed as an increased bid.   And despite the fact that

23   Augmedics said that they would not be participating in any

24   additional bidding, that at the last hearing there was another

25   bid.

1          I also wanted to address the backup bidder issue.  I

2   would like some clarity from the Court on that, given the fact

3   that under the bidding procedures, Brainlabs was the backup

4   bidder, and I struggle to see how we could slide ahead of

5   Brainlabs as the backup bidder if we couldn't bid against

6   Augmedics as the primary bidder.  So I'd like some clarity on

7   that, whether it's even permissible for us to act as the backup

8   bidder or not, but we're certainly willing and able to do so.

9   That's all I have, Your Honor.  And I appreciate your comments.

10  Thank you.

11          THE COURT:  No, thank you.

12          Okay.  So does anyone else wish to be heard?

13          Okay.  Before the Court is request for approval of

14  the digital health business assets to Augmedics free and clear

15  of all liens, claims, and encumbrances.  This is a continuation

16  of an emergency motion that was filed at Docket Number 26.

17  There's been more than proper notice and service of today's

18  hearing and service of the motion.  This is a core proceeding

19  under 28 USC 157(b)(2), the sale of assets.  And Court has

20  jurisdiction to enter under 28 USC 1334.

21          This motion was originally filed on June 19th.  In

22  connection with this motion, the Court approved bidding

23  procedures, and there was an auction conducted in accordance

24  with those procedures.  Augmedics was declared the winner of

25  the auction.  Since the filing of that winning -- notice of the

1  winning bidder, another entity came through, Surgical

2  Technologies and wanted to place a topping bid.

3          Let me just deal with the -- just basics and get back

4  to first principles, which is always the Bankruptcy Code.

5  Section 363 of the Bankruptcy Code authorizes -- well, we can

6  say 363(b), authorizes the debtor with notice and a hearing to

7  sell assets outside of the ordinary course of business.  The

8  standard to sell developed by courts, especially the one that

9  this Court is bound by, is the concept of business judgment.

10 Substantial deference is given to business judgment here.

11 Right?

12         Obviously -- and just note, you know, the duty of the

13 debtor, right, is to maximize the value of the estate.  There

14 was a bidding procedures set forth, and that process was

15 intended to maximize the value of the estate.  Therefore, in

16 other words, if one follows the bidding procedures and a winner

17 is declared, parties are provided notice of the sale, parties

18 in interest who may have a -- you know, an interest in the

19 assets because the assets were to be sold free and clear, to

20 the extent that there were any, constitutional due process was

21 provided to parties through notice.

22         But there's also a process, that is determined, if

23 one follows that process, then therefore, one has essentially

24 provided a -- you know, a runway for a debtor to follow and in

25 their advisors to say that, you know, they've maximized the

1   value of the estate, they've done what they could.  And that's

2   what the debtor did here.

3         And there was an initial bid of $900,000.  There was

4   an objection because there was a topping bid placed by

5   Augmedics.  And now -- the Court was not comfortable proceeding

6   on that day.  There were some bids, and I wanted to make sure

7   that -- quite frankly, that the Committee had an opportunity to

8   kind of be able to consult and provide some transparency to the

9   process.

10         I would note, and I think Mr. Martin kind of

11   correctly noted, you know, parties are entitled to notice of a

12   hearing.  Parties in interest are entitled to notice of a

13   hearing.  There is no really kind of -- you know, outside of

14   the process that the Court has established, right, no one

15   really has a right to buy the asset.  But there's a process in

16   place in which one can say they followed and are entitled to be

17   declared the winner.  And that's really kind of where Augmedics

18   was.

19         And I certainly understand the role that Mr. Martin's

20   clients played here and based upon the evidence -- and I want

21   to make sure that I provide a clear record -- they've done

22   nothing wrong.  Mr. Martin has done nothing wrong.  They

23   weren't notified about the assets.  And A&M did nothing wrong,

24   right?  It's -- there's always going to be someone who doesn't

25   know about the process, and that's kind of what happened here.

1    And -- but the debtor did what it could to proceed with a

2    higher bid, felt it was -- had a duty -- a fiduciary duty to do

3    so.

4            I'm going to declare Augmedics as the winning bidder,

5    and it's -- I'm only going to allow them to be declared the

6    winner.  I'm not going to declare a backup bidder.

7            I think, Mr. Pesce, if things don't close with

8    Augmedics, then just come back really quickly with someone.

9    And I think, you know, we can do that on less than 24-hours'

10   notice.  There's been notice that as to, you know, whether

11   Mr. Martin's client will be the winner of that.  And you can

12   come in here really fast with me and that process can take care

13   of because I'm not opening the auction back.  I'm just going --

14   there's -- if you've got something and it's high, then come

15   into court with it.

16           But I'll just declare Augmedics as the winner.  I

17   think that the debtors have satisfied their business judgment,

18   and I do believe business judgment has been established, and I

19   do really want to make sure that -- you know, that the process

20   has been followed.  And sometimes I think this is one of the

21   results of the process.  But I do note a lot more money has

22   come in into the door.

23           Everybody has done their job and I really appreciate

24   it.  This is what happens when you have high-end professionals.

25   And so I don't think anyone was put in a difficult position.  I

1  think the process -- you know, this happens from time to time

2  and Augmedics is the winner today.  You know, we'll see if they

3  can close.

4         But based on everything that's before me, I think

5  they're entitled to the protections of 363(m).  And there's --

6  I'm finding of no collusion under the 363(m).  And I think

7  debtors' counsel did their job and they're really good at it

8  and I appreciate it.  And I think the Committee has done

9  exactly what it was supposed to do, and I appreciate them, and

10 I appreciate the work that Mr. Martin did.  I think everyone

11 did what they were supposed to do.

12        Augmedics is the winner.  They won the auction, and

13 they put up more money now, and the debtor did what they were

14 supposed to do.  But I'm going to declare Augmedics as the

15 winner, and I'll approve an order that way.

16        Mr. Pesce, I don't know if I need to sign an order.

17 Kind of -- I don't know if I can just strip out the whole

18 backup bidder piece.  But I'm telling you, on less than -- on

19 24-hours' notice, if something doesn't close, just come back

20 and you pick the winner.  You pick who you want to go with, and

21 we're not going to get into kind of a -- you know, just --

22 you're just going to come in and tell me who you want, and

23 we'll go forward.  And if it's Mr. Martin's client, that's

24 completely fine with me.  I feel comfortable with proceeding on

25 that way.

1    And I appreciate the process that A&M ran and that

2  the Committee was a consulting party.  I'm comfortable with the

3  process.  And there's a lot of money that's coming into the

4  estate, and so let's not lose sight of that either.

5    Mr. Pesce, let me ask you, does it make sense for me

6  to sign or kind of -- you know, maybe I'd ought not do that,

7  maybe?  I don't know.  Is it possible for me to kind of

8  Isqurize the order?  Or should I stay away?

9    MR. PESCE:  I think the order we filed earlier today

10  is -- you should be able to sign the order we filed earlier

11  today.  I don't think it has -- it doesn't have anything about

12  Mr. Martin's backup bid.  And we --

13    THE COURT:  Okay.

14    MR. PESCE:  We'll -- we, you know, understand your

15  comments, and can act in that way if the unexpected occurs.

16    THE COURT:  Alrighty.  Very much appreciate

17  everyone's time today, and I appreciate giving me a little

18  patience with a little matter earlier today.  Thanks for

19  everyone.  You all have a good day.  Thank you.

20    MR. PESCE:  Thank you, Your Honor

21    (Proceedings concluded at 2:34 p.m.)

22    *  *  *  *  *

23

24

25

1                           **<u>C E R T I F I C A T I O N</u>**

2

3              I, Alicia Jarrett, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9

10   _____

11   ALICIA JARRETT, AAERT NO. 428        DATE: August 14, 2023

12   ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25